# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

MARIO ROSALES and
GRACIE LASYONE,

    *Plaintiffs,*

v.

JIM LEWIS and SAMUEL TERRELL,
sued in their individual and official
capacities; RONNEY HOWARD, sued
in his official capacity; and the CITY
OF ALEXANDRIA, LOUISIANA,

    *Defendants.*

Civil Case No. 1:22-cv-5838

Judge: _____

Magistrate Judge: _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Marie Miller*
IN Bar No. 34591-53

Patrick Jaicomo*
MI Bar No. P-75705

Anya Bidwell*
TX Bar No. 24101516

INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
mmiller@ij.org
pjaicomo@ij.org
abidwell@ij.org

*\*Pro Hac Vice* motions to be filed

*Lead Counsel for Plaintiffs*

Joseph P. Beck, III
Bar Roll No. 28312

LAW OFFICES OF JOE BECK
5529 Monroe Hwy.
Ball, LA 71405
Tel.: (318) 640-9202
Fax: (318) 640-9203
joe@joebecklaw.com

*Local Counsel for Plaintiffs*

## INTRODUCTION

1.      This is a civil-rights lawsuit to enforce rights secured by the First and Fourth Amendments to the Constitution of the United States.

2.      Two Alexandria police officers stopped and interrogated a motorist, Mario Rosales, and his passenger, Gracie Lasyone, without legal justification after Mario signaled and made a legal left turn at a green light. Neither Mario nor Gracie had demonstrated suspicious behavior. Neither were suspects of a crime. And neither has a criminal history. The officers interrogated Mario and Gracie about drug crimes that the officers had no reason believe had been committed; they frisked Mario without reason to believe he was armed and dangerous; they searched his pockets; and they flatly prohibited Mario and Gracie from recording the unlawful detention.

3.      The Fourth Amendment prohibits law-enforcement officers from stopping individuals when the officers lack reasonable suspicion that criminal activity is afoot.

4.      The Fourth Amendment similarly prohibits law-enforcement officers from prolonging a detention—even if the detention was lawfully initiated—to investigate crimes for which the officers lack reasonable suspicion.

5.      The Fourth Amendment also prohibits law-enforcement officers from frisking individuals without reasonable suspicion that they are both armed and dangerous.

6.      The Fourth Amendment likewise prohibits law-enforcement officers from searching individuals for contraband without a warrant and in the absence of a lawful arrest.

2

7.   The First Amendment protects individuals' right to record the police, subject only to reasonable time, place, and manner restrictions.

8.   The two Alexandria police officers who detained Mario and Gracie violated each of these clearly established constitutional protections by stopping Mario and Gracie without reasonable suspicion of criminal activity, by prolonging the detention to investigate drug crimes for which the officers lacked reasonable suspicion, by frisking Mario without reasonable suspicion that he was armed and dangerous, by searching Mario's pockets without a warrant, and by flatly banning Mario and Gracie from recording the officer's actions during the unlawful stop.

9.   The City of Alexandria likewise violated Mario's and Gracie's clearly established Fourth and First Amendment rights because the two officers who detained Mario and Gracie carried out unconstitutional municipal policies or customs, including that:

a.   officers are trained and encouraged to pull over motorists and passengers without reasonable suspicion of criminal activity, by identifying a non-existent traffic infraction;

b.   officers who have pulled over motorists and passengers based on an alleged minor traffic infraction are trained and encouraged to expand and prolong the stop to interrogate the detained individuals about crimes for which the officers lack reasonable suspicion and to search the detained individuals for weapons or contraband;

3

c.  officers who have pulled over motorists and passengers based on an alleged minor traffic infraction are trained and encouraged to frisk the detained individuals without reasonable suspicion that they are armed and dangerous;

d.  officers who have pulled over motorists and passengers based on an alleged minor traffic infraction are trained and encouraged to search a detained individual without a warrant and in the absence of a lawful arrest, by coercing the person to empty his or her pockets; and

e.  officers are trained and encouraged to prohibit detained individuals from recording police activity during a traffic stop regardless of whether the traffic stop was wrongfully initiated, unlawfully expanded in scope, or unreasonably prolonged, and regardless of whether the recording could be performed in a non-disruptive manner.

10.  For these reasons and others set forth below, Mario and Gracie bring this action seeking three remedies for the violation of their constitutional rights:

a.  a declaration that the City of Alexandria, Louisiana, and its police officers violated Mario's and Gracie's constitutional rights;

b.  compensatory, punitive, and nominal damages; and

c.  an injunction ordering the City of Alexandria to cease its unconstitutional policies.

## PARTIES

*Plaintiffs*

11.    Plaintiffs Mario Rosales and Gracie Lasyone are citizens of the United States.

12.    When the events underlying this lawsuit occurred, Mario and Gracie both worked at an Alexandria business that provides home services, primarily HVAC (Heating, Ventilation, and Air Conditioning) and generators. Mario and Gracie had departed from work for the day shortly before the events underlying this case happened.

*Defendants*

13.    Defendants Jim Lewis and Samuel Terrell are police officers with the Alexandria Police Department. They were police officers employed by the City of Alexandria, Louisiana, when the events underlying this case happened.

14.    Officers Lewis and Terrell are sued in their individual and official capacities.

15.    On information and belief, Officer Lewis is a senior officer with the department and was training or supervising Officer Terrell when the events underlying this case happened.

16.    Defendant Ronney Howard is sued in his official capacity as the Chief of Police for the City of Alexandria, Louisiana.

17.    The City of Alexandria, Louisiana, is sued as the government entity responsible for the offices occupied by Officers Lewis and Terrell and Chief Howard.

18. The City of Alexandria is a municipal corporation operating under the Constitution and laws of the State of Louisiana. It is charged, among other things, with the duty to supervise, manage, train, and control its Police Department to prevent the violation of individuals' civil rights.

19. The City of Alexandria was at all material times the employer of Officers Lewis and Terrell and Chief Howard.

20. Officers Lewis and Terrell and Chief Howard were, at all relevant times, operating under the color of state law.

21. Chief Howard was, at all material times, a final decisionmaker for departmental policies about how Alexandria police officers may conduct investigations, including traffic stops.

## JURISDICTION AND VENUE

22. Mario and Gracie bring this lawsuit under the First and Fourth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

23. This Court has jurisdiction under 28 U.S.C. § 1331.

24. Venue in this Court is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS[1]

### *The Initial Stop*

25. At about 5 p.m. on June 15, 2022, Mario Rosales and Gracie Lasyone left work in Alexandria, Louisiana. They were in Mario's 2007 red Mustang, with Mario driving.

---

[1] The events underlying this lawsuit were captured by various cameras. For the Court's convenience, videos of the underlying events are available at the following links:

26.  Mario's car had a New Mexico license plate indicating that registration would not expire until October 2022:



(license plate number redacted)

27.  The vehicle was in proper working order and was not making loud noise or emitting fumes or smoke.

28.  Mario and Gracie were driving southwest on Jackson Street. They demonstrated no suspicious behavior and were not in a high-crime area of Alexandria. It was light outside, as the sun had not yet set. It was not raining; the sky was clear of clouds.

29.  As they approached Dorchester Drive, a cross street, Mario turned on his left turn signal, which was in proper working order. The light at the intersection was

---

Link 1: compilation, audio on Mario (https://youtu.be/60oqCMv7NYE)
Link 2: compilation, audio on Gracie (https://youtu.be/uLCO7aktwzs)
Link 3: Officer Lewis's body camera (https://youtu.be/0XjELiN3TZc)
Link 4: Officer Terrell's body camera (https://youtu.be/Z6z35SUVpdQ)
Link 5: dash camera footage A (https://youtu.be/ulO3yNgZYAo)
Link 6: dash camera footage B (https://youtu.be/xqvFJ8yzDfw)
Link 7: security camera footage (https://youtu.be/v4ixdtraXYQ)

red, and he stopped. About 10 to 15 seconds later, an Alexandria Police Department SUV stopped behind him at the light.

30.    About 10 seconds after that, the light turned green. With his left turn signal blinking, Mario legally turned left through the intersection, onto Dorchester Drive. The police SUV followed. While the SUV was in the middle of the intersection, the officers activated its lights and pulled Mario and Gracie over.

31.    Contradicted by clear video evidence, the officers would later claim to have pulled the car over for failure to signal.

32.    Mario immediately pulled over and waited in his car. Gracie likewise remained buckled in the car.

33.    Officer Samuel Terrell got out of the SUV and stood at the front of the police vehicle. He told Mario to get out of the car and come to him.

34.    Mario calmly got out of the car and gave Officer Terrell his driver's license.

35.    At this point, Mario thought the officers were possibly looking for someone and had mistaken him for that wanted person.

36.    Officer Terrell asked for Mario's proof of registration, and Mario told him it was in the car. Mario and Officer Terrell walked to the driver's side of Mario's car, and Mario calmly retrieved his proof of registration.

37.    Mario and Officer Terrell walked back to the hood of the police SUV, and Mario started to pull up his insurance information on his phone.

38.  Neither Officer Terrell nor Officer Lewis expressed any concern about Mario's use of his phone to provide his insurance information.

39.  While Mario was retrieving his insurance information, Officer Lewis approached the passenger side of Mario's vehicle, asked Gracie some questions, and told her to place her hands on the dashboard. Gracie calmly answered Officer Lewis's questions and placed her hands on the dashboard as instructed.

40.  Mario calmly told Officer Terrell, "All right now I'm getting agitated. Why did I get pulled over?" Officer Terrell responded, "I'll tell you in a second."

***Officer Terrell searches Mario.***

41.  Mario handed Officer Terrell his proof of registration and was continuing to retrieve his proof of insurance on his phone when Officer Lewis approached Mario and asked, "Hey you got a gun in the car?"

42.  Mario replied, "I have one in my bag, yeah."

43.  "Okay, where is it at?" asked Officer Lewis.

44.  "In the back seat," Mario answered truthfully.

45.  "In the back seat? Okay, what is it?" asked Officer Lewis.

46.  "It's a Taurus." Mario replied.

47.  "Huh?" asked Officer Lewis.

48.  "It's a Taurus," Mario repeated. Taurus is a brand of firearms.

49.  "Okay," said Officer Lewis.

50.  "Do you have any on you?" asked Officer Terrell.

51.  Mario shook his head and said, "No, not on me."

9

52.   Officer Terrell said, "I tell you what. Set your phone down right here. Put your hands on the bumper, just real quick. Real quick."

53.   Mario complied, setting his phone on the hood of the police SUV and placing his hands on the bumper.

54.   Officer Terrell started frisking Mario:



55.   Officers Terrell and Lewis extended the length and expanded the scope of the traffic stop by frisking Mario.

56.   Officers Terrell and Lewis had no particularized, objective reason to believe that Mario was lying when he said he did not have any weapons on him.

57.   Officers Terrell and Lewis had no particularized, objective reason to believe that Mario had any weapons on his person.

58.   Officers Terrell and Lewis had no particularized, objective reason to believe that Mario was dangerous.

59. While Officer Terrell was frisking Mario, Officer Lewis asked Mario, "Hey, can I have your permission to retrieve that firearm out of your gun, or out of your uh vehicle?"

60. Mario answered, "No, I don't want anybody searching my vehicle."

61. "Okay, cool. Yeah, I get it," said Officer Lewis.

62. Officer Terrell then finished frisking Mario.

63. Officer Lewis told Gracie to unbuckle and step out of the vehicle. She complied. He told her, "You can leave everything right there and just step out for me, okay. You don't have any guns on you, do you?"

64. "No, sir," she answered.

65. Officer Lewis told Gracie to wait at the front of the police vehicle. She complied.

***Officers Lewis and Terrell inspect Mario's car, search Mario's pockets, and prohibit Mario and Gracie from recording them.***

66. Officer Lewis approached Officer Terrell and told him, "Hey, 32:104 and 32:352 uh, for the uh, PC."

67. Louisiana Revised Statute 32:104 addresses turning movements and required signals. Louisiana Revised Statute 32:352 addresses mufflers, prevention of excessive noise, fumes, and smoke.

68. When Officers Lewis and Terrell said "PC," they were referring to probable cause to stop Mario and Gracie.

69. Officer Lewis approached the driver's side of Mario's car and peered into the open window:

11



70.   He then approached Mario at the front of the police vehicle.

71.   Officer Terrell took Mario's phone and proof of registration and placed them in the police vehicle.

72.   Officer Lewis said to Mario, "Hey, listen I don't know if my partner has done this or not, but I'm going to do it, okay," and he gave Mario *Miranda* warnings. He then asked Mario, "Do you understand your rights?" Mario answered, "Yeah."

73.   Officer Lewis then said to Mario, "A traffic stop is a legal detainment. The reason I did that is I got a couple questions that may or may not pertain your guilt or innocence, all right. So I always advise before I ask those types of questions. That goes to the … the Fifth Amendment, all right. So anytime you're not comfortable with one of my questions, you can say, 'pass.' Are you familiar with the Fifth Amendment?"

74.   Mario answered, "Yeah."

75.   "Okay, how long have you been in the state of Louisiana?" Officer Lewis asked.

76. Mario answered that he had been there off and on; was originally from Roswell, New Mexico; was trying to establish residency in Louisiana; worked at Atlas Home Service; and was trying to buy a home.

77. Officer Lewis asked, "You ever been arrested for anything?"

78. Mario answered, "No."

79. "Never?" Officer Lewis asked.

80. Mario responded, "No."

81. "I gotcha," Officer Lewis said. "Do you mind emptying your pockets for me on the hood of my car?"

82. Under the circumstances, the officer's question indicated a condition: Mario needed to empty his pockets himself or else the officers would search him themselves—like they had frisked him—arrest him, or otherwise make the detention longer or more intrusive:



83. Mario showed the officers his hands to make sure they wanted him to reach into his own pockets:



84.   Mario then pulled out the contents of his pockets (a wallet and keys) and placed them on the hood of the vehicle. "That's it," Mario said.

85.   By searching Mario's pockets, Officers Lewis and Terrell extended the length and expanded the scope of the traffic stop.

86.   "Nothing else? Do you mind if I check?" Officer Lewis said.

87.   Mario told him that Officer Terrell had already checked.

88.   Officer Terrell said, "I just patted you down. I didn't check, search you."

89.   Officer Lewis patted the bumper bar of the SUV and said, "Grab my bar real quick. Do you mind if I check? Do you have something on you that you're not supposed to have?"

90.   Mario responded calmly, "I don't have anything on me."

91.   "Yeah, yeah, yeah, okay," said Officer Lewis.

92.   As Officer Lewis would later acknowledge, he had no reason to believe that Mario was being anything but completely truthful.

93.   Mario continued, "I mean, I would feel a lot safer if she [Gracie] had her phone and she was able to record while you check me."

94. "Yeah, yeah, I'm recording," said Officer Lewis, pointing to his body camera. "Body camera," he specified.

95. Officer Terrell likewise said, "It's being recorded right now, sir."

96. Mario explained that he didn't trust that the body camera footage would be maintained because the body camera footage for a prior incident with an officer was lost.[2]

97. Gracie asked Officer Terrell, "Can I just grab my phone, out of the car, while you watch me?"

98. Officer Terrell motioned for her to stop talking and pay attention to what Officer Lewis was saying.

99. Despite Mario's explanation for why he wanted Gracie to be allowed to record the stop, Officer Lewis did not allow Mario or Gracie to record anything. He instead simply said, "I promise I won't lose mine," referring to his body camera footage.

100. Officers Lewis and Terrell had no reason to believe that Gracie or Mario would be disruptive in recording the stop on their phones.

101. Officer Terrell had allowed Mario to use his phone to provide proof of insurance. And Mario had so used his phone without disrupting the officers' work.

---

[2] Mario was criminally assaulted by an off-duty officer in Roswell, New Mexico, in 2018. *See Rosales v. Bradshaw et al.*, 2021 WL 5356668, CIV 20-751 JB/JHR at *3 (D.N.M. Nov. 17, 2021), *appeal filed*, No. 22-2027 (10th Cir.). Mario could not obtain body camera or dash camera footage from the officer or his employer.

15

102. Officers Lewis and Terrell could have easily allowed Mario or Gracie to record the incident in a safe and nondisruptive manner, using their phones to record the stop and for no other purpose.

103. Mario and Gracie had shown the officers, in part by their compliance and calm demeanors and by Mario retrieving his insurance information on his phone, that they could use their phones to record the encounter in a safe way that would not thwart the officers' legitimate police activities.

104. Officers Lewis and Terrell's absolute ban on Mario or Gracie recording any of the stop was not narrowly tailored to further a legitimate government interest.

105. "So, here's my question," continued Officer Lewis, speaking to Mario. "Turn, face me. I always like to talk to people face on."

106. Mario was still facing the hood of the police vehicle with his hands on the bumper bar. He turned about 90 degrees to the right to face Officer Lewis.

107. Officer Lewis told Officer Terrell to take Gracie to the passenger side of the police SUV. Officer Terrell and Gracie complied.

### Officer Lewis interrogates Mario.

108. Once Officer Terrell brought Gracie to the passenger side of the police SUV, he started interrogating her. At the same time, Officer Lewis interrogated Mario.

109. Officer Lewis asked Mario a series of questions about drugs.

110.   Officer Lewis had no particularized, objective reason to believe Mario or Gracie had committed any drug crimes, were going to commit any drug crimes, or were otherwise involved in any drug crimes.

111.   To each question Officer Lewis posed, Mario answered clearly, calmly, quickly, definitively, and unequivocally.

112.   Officer Lewis began, "Anything in the vehicle that you shouldn't have?"

113.   Mario answered, "No."

114.   Officer Lewis: "You ever been arrested for anything?"

115.   Mario: "No, I have not."

116.   Officer Lewis: "Never?"

117.   Mario: "Never. I have a clean record."

118.   Officer Lewis: "I gotcha. Any marijuana in the vehicle?"

119.   Mario: "No."

120.   Officer Lewis: "Uh, meth?"

121.   Mario: "No."

122.   Officer Lewis: "Uh, heroin?"

123.   Mario: "No."

124.   Officer Lewis: "Fentanyl?"

125.   Mario: "No."

126.   Officer Lewis: "Prescription pills not prescribed to you?"

127.   Mario: "No."

128.   Officer Lewis: "Okay. Cocaine?"

17

129. Mario: "No."

130. Officer Lewis: "Crack cocaine?"

131. Mario: "No. I don't do drugs. I don't mess with any kind of illegal substances or drugs."

132. By interrogating Mario about drug crimes, Officers Lewis and Terrell extended the length and expanded the scope of the traffic stop.

133. Officer Lewis asked Mario about where he lives.

134. Mario explained that he is sometimes in Louisiana and sometimes in Roswell, New Mexico, and when he is in Louisiana, he stays at Gracie's sister's house in Dry Prong, Louisiana.

135. Officer Lewis paused and then asked about drugs again. "Do you smoke weed?"

136. Mario answered, "No." He informed the officer that a hair follicle or urine test would show he is clean.

137. Officer Lewis next asked Mario about his relationship to Gracie, where they had been, and where they were going. Mario answered honestly. He said they were coming from work, had stopped at the bank, and were headed to pick up a car part from someone who was selling it on Facebook; he could show Officer Lewis the Facebook message on his phone.

138. Officer Lewis told Mario to wait there.

139. Officer Lewis started walking around Mario toward Officer Terrell and Gracie. He told Mario, "You know a traffic stop is a legal detainment, right. You were

detained on a traffic stop." He added, "Just letting you know. You seem like a constitutionalist to me. Are you?"

140. Mario: "Uh, a little bit, yeah."

141. Officer Lewis: "Oh I'm a lot a constitutionalist."

142. Officer Lewis then told Officer Terrell to switch places with him.

***Officer Terrell interrogates Gracie and prohibits recording.***

143. While Officer Lewis had been questioning Mario, Officer Terrell had been questioning Gracie.

144. Gracie stood near the police SUV with her back facing the passenger side. She stood underneath flashing lights on the top of the SUV, and between the side-view mirror and a window with a picture of a dog with lettering that stated, "WARNING K-9 KEEP BACK":



145. Officer Terrell gave Gracie *Miranda* warnings. While he did so, Gracie stood calmly with her hands at her sides, looking at Officer Terrell while squinting and blinking into the sun.

146. Officer Terrell then paused for about three seconds before asking, "Is there anything illegal in that vehicle?"

147. Less than half a second later, without hesitating, Gracie shook her head and said calmly, "Not to my knowledge."

148. Officer Terrell said, "There was some hesitancy there."

149. Gracie put out her hand and shook her head to indicate that she disagreed.

150. Officer Terrell continued, "If there was, what do you think it would be?"

151. Gracie again shook her head and said, "I don't think there's anything in there."

152. Officer Terrell asked Gracie where she is from, how long she and Mario had been dating, where Mario is from, and how often he goes to Roswell.

153. Gracie's answers matched Mario's. She calmly answered every question.

154. Officer Terrell then asked, "You ever been arrested for anything?"

155. Gracie: "No sir."

156. Officer Terrell: "Ever had any warrants issued for your arrest?"

157. Gracie chuckled and shook her head, saying, "Not to my knowledge."

158. Officer Terrell: "You ever done any types of drugs?"

159. Gracie shook her head and said, "No." She then asked Officer Terrell, "Is there a reason for these questions?"

160. Officer Terrell responded, "Yeah, I'm just curious."

161. Gracie asked, "Why?"

162. Officer Terrell explained, "We're just talking while he's talking … ."

163. Gracie followed up, asking why Officer Lewis was questioning Mario.

164. Officer Terrell answered, "Cuz he's curious."

165. Gracie again asked, "Why?"

166. Officer Terrell mumbled and said, "Just curious."

167. "You just pull people over because you're curious?" Gracie questioned.

168. Officer Terrell responded, "Well, I mean, you … he failed to signal, so that's why I pulled you over, and then once we started talking I got curious."

169. Gracie expressed doubt about the practice. Officer Terrell responded, "It's a real thing," indicating that the officers' practice of pulling people over and then interrogating about drugs or other conduct about which the officers were "curious" was part of a departmental policy.

170. Officer Terrell paused for about eight seconds. He then asked Gracie what Mario does for work.

171. Gracie answered that he works at Atlas Home Service and showed Officer Terrell the front of her T-shirt, which had a large heart with "ATLAS, 10 YEARS IN BUSINESS" written inside it.

172. Gracie and Officer Terrell stood in silence for about 17 seconds. Then Gracie asked Officer Terrell if it was possible for her to grab her phone, wanting to record what was happening.

173. Officer Terrell did not allow her to get her phone to record and promised that the officers were recording the detention themselves.

174. Gracie explained that they wanted to record because Mario had had a bad experience in the past.

175. Still, Officer Terrell flatly refused to let Gracie record any of the encounter.

176. Officer Lewis then said to Mario, "You know a traffic stop is a legal detainment, right. You were detained on a traffic stop."

177. Officer Terrell asked Gracie if she heard what Officer Lewis said, referring to a traffic stop being a legal detainment.

178. Then Officers Lewis and Terrell traded places.

### *Officer Lewis interrogates Gracie.*

179. Officer Lewis asked Gracie if Officer Terrell had advised her of her rights.

180. Gracie calmly replied, "Yes."

181. Officer Lewis then started asking her questions.

182. Officer Lewis started with, "You ever been arrested for anything?"

183. Gracie: "No sir."

184. Officer Lewis then asked where she and Mario were coming from. She answered that they were coming from work and had stopped at the bank, matching Mario's description of where they had been.

185. Officer Lewis then asked if there was anything in Mario's car that he and Gracie shouldn't have.

186. Gracie answered, "No, sir."

187. Demonstrating that it was departmental policy or custom to use pretextual stops to conduct unjustified investigations, Officer Lewis then asked Gracie a nearly identical set of questions to those they had asked Mario.

188. Officer Lewis: "Do you smoke marijuana?"

189. Gracie: "No."

190. Officer Lewis: "Never?"

191. Gracie: "No."

192. Officer Lewis: "Wow. Meth?"

193. Gracie: "No."

194. Officer Lewis: "Heroin?"

195. Gracie: "No."

196. Officer Lewis: "Cocaine?"

197. Gracie: "No."

198. Officer Lewis: "Crack cocaine?"

199. Gracie: "No."

200. Officer Lewis: "Prescription pills not prescribed to you?"

201. Gracie: "No."

202. Officer Lewis: "Nothin'? You ever been in any kind of trouble at all?"

203. Gracie: "No, sir."

204. Officer Lewis finished his questioning by saying, "Okay. All right. I believe you." He then directed Gracie to stand by the hood of the police vehicle. Gracie complied.

***Officer Terrell interrogates Mario and prohibits recording.***

205. While Officer Lewis was interrogating Gracie, Officer Terrell was interrogating Mario. But before Officer Terrell began asking Mario questions, Mario asked Officer Terrell if he had Mario's phone.

206. Officer Terrell initially said that he did not, but later said he did have Mario's phone in the police vehicle.

207. Mario then asked, "So, can you be honest with me? Why am I being stopped?"

208. Officer Terrell responded, "Failure to signal. That's straight, pure and straight honest answer. You failed to signal, so we stopped you. And we're just talking to people after we stop them, okay. That's all it is, okay. So I don't know what all he talked to you about. I will probably have some of the same questions."

209. Officer Terrell asked Mario about where he lives. Mario reiterated what he had told Officer Lewis.

210. Meanwhile, Officer Lewis was once again peering into Mario's car:



211. Officer Terrell next walked to the passenger side of the police vehicle and told Mario, "Hey, here's your phone," and placed it on the hood of the SUV. "Don't touch it yet," he ordered.

212. Mario asked, "I can't record this?"

213. Officer Terrell responded that it's being recorded by the officers. He added, "Right now you are legally detained. So we're not doing anything extra."

214. Officer Lewis moved to the driver's side of Mario's car and peered in yet again.

215. Officer Lewis walked toward Mario and Gracie. At that time, Officer Terrell started writing on a traffic citation form.

216. Gracie asked Officer Lewis if she could get her phone, and Mario asked him if Gracie could leave.

217. Officer Lewis answered no to both questions.

***Officers Lewis and Terrell ask for criminal history checks, talk about Mario and Gracie, and ticket Mario.***

218. Officer Lewis walked to the driver's side of the police SUV and got inside. He asked Officer Terrell, "Did you call them up yet?" referring to history checks on Mario and Gracie.

219. Officer Terrell answered that he had not.

220. Officer Lewis told Officer Terrell, "I would say that there's more to this than meets the eye." He said that he would check Mario's and Gracie's driver's licenses.

25

221. Officer Terrell then called dispatch and requested historical information about Mario and Gracie—a "70 check" and a "32 check."

222. Officer Lewis soon asked Officer Terrell, "So what are you gonna write him for?"

223. Officer Terrell: "Right now, failure to signal. Uh, since he keeps going back and still has residence in New Mexico … ."

224. Officer Lewis told Officer Terrell, "I would err on the side of caution on that," meaning that Officer Terrell should, despite his uncertainty that Mario had violated any registration statutes, cite Mario for not having updated his license and registration to reflect where he stays in Louisiana.

225. After a pause, Officer Lewis said that he didn't have a reason to run their dog on Mario's car and that he "really didn't see a whole lot of indicators of him [Mario] not being completely truthful."

226. Officer Lewis soon advised Officer Terrell, "So yeah I would do the PC to stop and there's also um, failure to update his ID, and you can go ahead and put failure to register on there, too."

227. Dispatch soon radioed the officers to give them the results of the history checks: "Negative all around on both."

228. Officer Lewis expressed disappointment: "Aaaw. What are the chances of that?!" He soon reiterated, "Aw man!"

229. The officers spent some more time on the citation form. Officer Lewis then told Officer Terrell to issue this one in a professional manner.

230. Officer Terrell explained the ticket to Mario and told him to sign it.

231. Mario asked if he could leave after that.

232. Officer Terrell said yes.

233. Mario signed the citation form.

234. Officer Terrell gave Mario a copy of the citation form, which was too faint to read except for the court date that the officer wrote directly on the carbon copy:



235.  Mario and Gracie gathered their items from Officer Terrell and the hood of the police vehicle, and Officer Terrell told them to have a good rest of their day. At that point, more than 21 minutes had passed since the officers pulled Mario and Gracie over without any legal justification.

236.  Mario asked for the officers' badge numbers and how to obtain the video recordings of the encounter. The officers answered, though Officer Terrell expressed his opinion of Mario's inquiries as he got into the police vehicle: "Well that's fucked up."

* * *

237.  Officer Terrell issued Mario a ticket for three violations: (1) failure to signal, La. Rev. Stat. 32:104; (2) failure to register a vehicle, La. Rev. Stat. 47:501; and (3) another allegation related to registering a vehicle.[3]

238.  All three charges were dismissed.

**INJURY TO PLAINTIFFS**

239.  Because their constitutional rights were violated, Mario and Gracie have lost their sense of security and trust in the Alexandria Police Department, its officers, and the American system of law enforcement generally.

---

[3] Officer Terrell's bodycam footage appears to show the handwritten ticket alleged a violation of La. Rev. Stat. 47:513, which concerns registering the vehicle of a person who is not a resident of Louisiana. However, a typed record of the ticket produced by the Alexandria Police Department indicates the third allegation was a violation of La. Rev. Stat. 47:501—the same as the second alleged violation. Finally, a third record concerning the ticket's resolution indicates that the third allegation was a violation of La. Rev. Stat. 47:508, which addresses expiration of registration.

240.  Because the officers pulled Mario over without reasonable suspicion, he was issued an invalid traffic ticket. He spent time researching how he could contest the ticket, and he spent time hiring an attorney to contest it. The possibility of being wrongly convicted of the traffic infractions and having to pay fines caused Mario stress and anxiety.

241.  The deprivation of Mario's and Gracie's First Amendment rights is a standalone cognizable injury.

242.  However, because Mario and Gracie were not permitted to record any of the incident, they spent resources trying to confirm their version of events right away. They asked local businesses if they had security camera footage of the stop. One business did but would not release the footage to Mario, only law enforcement or an attorney. Mario consulted and worked with an attorney to obtain the business's footage, which did not include audio and captured only the first part of the stop. Mario then worked with an attorney to obtain the dashcam and bodycam footage from the Alexandria Police Department. The records request for the footage was submitted two days after the incident, on June 17, 2022. The footage cost $60, and the Department did not release the footage until 20 days after the stop, on July 5, 2022.

243.  If Mario and Gracie had been allowed to record the incident, they would have been able to address the traffic ticket and seek redress for the violation of their constitutional rights more quickly, using fewer resources, and without having to wait for the government's record of the events to confirm what happened.

244.   Mario and Gracie spent time in detention instead of being free to go about their business.

245. Because of the officers' and the city's violation of their constitutional rights, Mario and Gracie suffered stress and anxiety.

246.   Unsettled by the officers' conduct during the incident, Mario has not driven his red Mustang since that day. He is worried that officers will once again pull him over and further detain, search, and otherwise invade the security of his person and property. He has lost the enjoyment and use of his vehicle and primary hobby. The vehicle needed a new battery from lack of use, and because Mario has to use one of his other vehicles for transportation, he has lost the option to sell that vehicle.

## CAUSES OF ACTION

### Count 1

**Violation of the Fourth Amendment, for unreasonable seizure in detaining Mario and Gracie without reasonable suspicion of criminal activity.**

***Brought by Mario and Gracie against Officers Lewis and Terrell in their individual capacities.***

247.   Mario and Gracie incorporate and reallege the allegations in paragraphs 1 through 246, above.

248. The Fourth Amendment's protection against unreasonable seizures prohibits the government, though its officers, from stopping motorists or passengers without a particularized and objective basis for suspecting the stopped person(s) of criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

249.    Officers Lewis and Terrell lacked a particularized and objective basis to suspect Mario or Gracie of criminal activity.

250.    More specifically, although Officers Lewis and Terrell alleged that their basis for stopping Mario was his failure to signal his turn, indisputable video evidence proves that Mario did signal his turn.

251.    Pulling Mario and Gracie over to detain them at all thus violated their clearly established Fourth Amendment rights to be free from unreasonable seizures.

252.    Mario and Gracie bring this constitutional claim for declaratory judgment under 28 U.S.C. § 2201 and for damages under 42 U.S.C. § 1983.

### Count 2

**Violation of the Fourth Amendment, for unreasonable seizure in expanding a traffic stop's duration and scope without reasonable suspicion.**

***Brought by Mario and Gracie against Officers Lewis and Terrell in their individual capacities.***

253.    Mario and Gracie incorporate and reallege the allegations in paragraphs 1 through 246, above.

254.    The Fourth Amendment's protection against unreasonable seizures prohibits the government, though its officers, from prolonging a traffic stop beyond the time reasonably required to address the traffic violation that warranted the stop and attendant safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). In other words, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.

255.   Because Officers Lewis and Terrell lacked reasonable suspicion to pull over Mario and Gracie, detaining them for any amount of time violated their clearly established Fourth Amendment rights to be free from unreasonable seizures.

256.   But even if the officers had reasonable suspicion to believe that Mario had violated a traffic law, the officers lacked reasonable suspicion to prolong the stop to investigate drug crimes.

257.   The officers also unreasonably prolonged the stop to frisk Mario for weapons when the officers lacked reasonable suspicion that he was both armed and dangerous.

258.   The officers also unreasonably prolonged the stop to search Mario's pockets without a warrant and without lawfully arresting Mario.

259.   The officers violated Mario's and Gracie's clearly established Fourth Amendment rights to be free from unreasonable seizures by expanding the detention to investigate crimes unrelated to the traffic-infraction basis for the stop, to search Mario for weapons, and to search Mario for contraband.

260.   Mario and Gracie bring this constitutional claim for declaratory judgment under 28 U.S.C. § 2201 and for damages under 42 U.S.C. § 1983.

## Count 3

### Violations of the Fourth Amendment, for unreasonable searches.

*Brought by Mario against Officers Lewis and Terrell in their individual capacities.*

261.    Mario incorporates and realleges the allegations in paragraphs 1 through 246, above.

262.    The Fourth Amendment's protection against unreasonable searches prohibits the government, though its officers, from stopping and frisking a person unless the officers observe unusual conduct which leads them reasonably to conclude that criminal activity may be afoot and that the persons with whom they are dealing may be armed and presently dangerous. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

263.    Because Officers Lewis and Terrell lacked reasonable suspicion to pull over Mario and Gracie, detaining Mario to search him violated his clearly established Fourth Amendment right to be free from unreasonable searches.

264.    But even if the officers had reasonable suspicion to believe that Mario had violated a traffic law, the officers lacked reasonable suspicion to believe that Mario was armed and presently dangerous. Frisking him thus violated his clearly established Fourth Amendment right to be free from unreasonable searches.

265.    The officers also lacked a warrant to search Mario's pockets and did not arrest him. The officers' search of Mario's pockets—by having him involuntarily empty his pockets to examine their contents—thus violated Mario's clearly established Fourth Amendment right to be free from unreasonable searches.

266.   Mario brings this constitutional claim for declaratory judgment under 28 U.S.C. § 2201 and for damages under 42 U.S.C. § 1983.

## Count 4

### Violation of the First Amendment right to record police.

*Brought by Mario and Gracie against Officers Lewis and Terrell in their individual capacities.*

267.   Mario and Gracie incorporate and reallege the allegations in paragraphs 1 through 246, above.

268.   The First Amendment protects the right to record the police, subject only to reasonable time, place, and manner restrictions, which must be narrowly tailored to serve a government interest. *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017).

269.   Officers Lewis and Terrell violated Mario's and Gracie's clearly established First Amendment rights to record the police by prohibiting them from recording the officers when that prohibition was not narrowly tailored to serve a government interest.

270.   Mario and Gracie bring this constitutional claim for declaratory judgment under 28 U.S.C. § 2201 and for damages under 42 U.S.C. § 1983.

## Count 5

## Violations of the Fourth Amendment, for unreasonable seizures.

*Brought by Mario and Gracie against Officers Lewis and Terrell and Chief Howard in their official capacities and the City of Alexandria, Louisiana.*

271. Mario and Gracie incorporate and reallege the allegations in paragraphs 1 through 246, above.

272. A local government is liable under 42 U.S.C. § 1983 for the deprivation of a right when conduct attributable to the government was undertaken with deliberate indifference to the relevant right and caused the alleged injury. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 400 (1997).

273. Conduct is attributable to the government if the rights deprivation resulted from a decision by a policymaker or a custom so widespread as to have the force of law. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978).

274. When municipal action itself violates federal law or directs an employee to do so, the municipal action was necessarily the moving force behind the complained injury. *Bd. of Cnty. Comm'rs*, 520 U.S. at 405.

275. On information and belief, in violating Mario's and Gracie's Fourth Amendment rights to be free from unreasonable searches and seizures, Officers Lewis and Terrell carried out unconstitutional policies that Chief Howard directed or encouraged, or that were so widespread within the Alexandria Police Department as to have the force of law. Those policies, which were carried out by Officers Terrell and Lewis in this traffic stop, included that:

a. officers are trained and encouraged to pull over motorists and passengers without reasonable suspicion of criminal activity, by concocting a baseless traffic infraction after the fact to support their actions.

b. officers who have pulled over motorists and passengers as described in paragraph 275a. above are trained and encouraged to expand the scope of and prolong the stop to interrogate the detained individuals about crimes for which the officers lack reasonable suspicion and to search the detained individuals for weapons or contraband without legal justification.

c. officers who have pulled over motorists and passengers as described in paragraph 275a. above are trained and encouraged to frisk the vehicle's occupants without reasonable suspicion that they are armed and dangerous.

d. officers who have pulled over motorists and passengers as described in paragraph 275a. above are trained and encouraged to search a person without a warrant and without making a valid arrest, by coercing the person to empty his or her pockets.

276. The foregoing policies were the moving force behind the violations of Mario's and Gracie's Fourth Amendment rights.

277. These policies further represent a threat to the constitutional rights of all individuals driving in the City of Alexandria, who may be subjected to similar

baseless fishing expeditions to turn up criminal activity without constitutional or legal justification.

278.  Mario and Gracie bring this constitutional claim for declaratory judgment under 28 U.S.C. § 2201, for damages under 42 U.S.C. § 1983, and for an order permanently enjoining Chief Howard and the City of Alexandria from implementing the above-listed policies.

### Count 6

**Violation of the First Amendment right to record police.**

***Brought by Mario and Gracie against Officers Lewis and Terrell and Chief Howard in their official capacities and the City of Alexandria, Louisiana.***

279.  Mario and Gracie incorporate and reallege the allegations in paragraphs 1 through 246, above.

280.  In violating Mario's and Gracie's First Amendment rights to record the police, Officers Lewis and Terrell carried out an unconstitutional policy that Chief Howard directed or encouraged, or that was so widespread within the Alexandria Police Department as to have the force of law. The policy was that officers are trained and encouraged to prohibit detained individuals from recording police activity during a traffic stop regardless of whether the traffic stop was wrongfully initiated, expanded in scope, or prolonged, and regardless of whether the recording could be performed in a non-disruptive manner.

281. This policy was the moving force behind Officer Lewis's and Officer Terrell's prohibition on Mario and Gracie from recording the officers during the stop.

282. Mario and Gracie bring this constitutional claim for declaratory judgment under 28 U.S.C. § 2201, for damages under 42 U.S.C. § 1983, and for an order permanently enjoining Chief Howard and the City of Alexandria from implementing the above-listed policy.

## PRAYER FOR RELIEF

For the injuries inflicted by the violations claimed above, Mario and Gracie respectfully request relief as follows:

A.     A judgment declaring that each defendant violated Mario's and Gracie's First and Fourth Amendment rights in the incident giving rise to this lawsuit.

B.     An order permanently enjoining Chief Howard in his official capacity and the City of Alexandria from implementing the City's unconstitutional policies, as outlined above.

C.     Compensatory damages as the jury may deem just and proper.

D.     Punitive damages as the jury may deem just and proper.

E.     Nominal damages in the amount of $1 for violations of the First and Fourth Amendments to the U.S. Constitution.

F.     Any costs and attorneys' fees to which Mario and Gracie may be entitled.

G.     All further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable under Federal Rule of Civil Procedure 38 and Local Civil Rule 38.1.

Dated: November 1, 2022

Marie Miller*
IN Bar No. 34591-53

Patrick Jaicomo*
MI Bar No. P75705

Anya Bidwell*
TX Bar No. 24101516

INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
mmiller@ij.org
pjaicomo@ij.org
abidwell@ij.org

*Pro Hac Vice motions to be filed

Lead Counsel for Plaintiffs

Respectfully submitted,

/s/ Joseph P. Beck, III
Joseph P. Beck, III
Bar Roll No. 28312

LAW OFFICES OF JOE BECK
5529 Monroe Hwy.
Ball, LA 71405
Tel.: (318) 640-9202
Fax: (318) 640-9203
joe@joebecklaw.com

Local Counsel for Plaintiffs