**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

**MARIO ROSALES, ET AL**                    **CIVIL ACTION NO. 1:22-CV-5838**

**VERSUS**                                          **JUDGE JERRY EDWARDS, JR.**

**JOHN LEWIS, ET AL**                         **MAGISTRATE JUDGE PEREZ-MONTES**

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)**

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

Respectfully submitted,


BY: *s/ Misty Shannon Antoon*
Misty Shannon Antoon, T.A. (#27079)
Misty@antoonlaw.com
2312 S. MacArthur Drive
Alexandria, LA 71301
318.792.3514

*Counsel for Defendants, City of Alexandria, Officer*
*Samuel Terrell and Former Chief Ronney Howard*

**TABLE OF CONTENTS**

I.    BACKGROUND .................................................................................................1

II.    SUMMARY OF FACTS .................................................................................2

III.    SUMMARY OF THE ARGUMENT .............................................................13

IV.    LAW AND ANALYSIS ................................................................................19

    A.  STANDARD FOR MOTION UNDER FRCP 12(c) ............................19

    B.  QUALIFIED IMMUNITY .................................................................20

    C.  COUNT 1 OF PLAINTIFFS' CLAIMS ARE DISCREDITED BY THE VIDEO EVIDENCE and LOUISIANA LAW – THE STOP WAS JUSTIFIED AT ITS INCEPTION .....................................................................................22

    D.  COUNTS 2, 3 and 5 OF PLAINTIFFS' CLAIMS ARE DISCREDITED BY THE VIDEO EVIDENCE AND LOUISIANA LAW AGAINST OFFICER TERRELL .................................................................................................27

    E.  COUNTS 4 and 6 ARE WITHOUT MERIT AS THERE WAS NO FIRST AMENDMENT VIOLATION BY OFFICER TERRELL ....................................39

    F.  COUNTS 5 AND 6 AGAINST FORMER CHIEF RONNEY HOWARD AND THE CITY OF ALEXANDRIA ARE WITHOUT MERIT ..................................42

    G.  PLINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES .......................45

V.    CONCLUSION................................................................................................45

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. al-Kidd*

      563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) ...............................21

*Ashcroft v. Iqbal,*

      556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)....................19,20,22,42

*Bell Atl. Corp. v. Twombly*

      550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)..................................19

*Beroid v. Lafleur*

      2023 U.S. App. LEXIS 9644, at *11 (5th Cir. Apr. 21, 2023) .....................................20

*Brunson v. McCorkle*

      No. 11CV1018 JCH/LAM, 2012 WL 13076260, at *5 (D.N.M. Sept. 18, 2012) .......40

*Carswell v. Camp*

      54 F.4th 307, 2022 WL 17335977, *3 (5th Cir. 2022)..................................................22

*City of Los Angeles v. Heller*

      475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)....................................42

*Collier v. Roberts*

      2015 U.S. Dist. LEXIS 30643, at *13 (M.D. La. Mar. 10, 2015)................................45

*Cunningham v. Panola Cty.*

      2011 U.S. Dist. LEXIS 57850, at *22 (E.D. Tex. May 8, 2011).............................17,37

*Dave v. Laird*

      2021 U.S. Dist. LEXIS 254682, at *34 (S.D. Tex. Nov. 30, 2021), adopted by 2022 U.S. Dist. LEXIS 40981, 2022 WL 889989 (Mar. 25, 2022)   ..........................................40

*Davila v. United States*

      713 F.3d 248, 259 (5th Cir. 2013)................................................................................30

*District of Columbia v. Wesby*

      138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018)...................................................19,23,34

*Durant v. Gretna City*

      2020 U.S. Dist. LEXIS 8422, at *66-67 (E.D. La. Jan. 17, 2020), aff'd sub nom. Durant v. Brooks, 826 F. App'x 331 (5th Cir. 2020)..................................................................40

*Estate of Davis ex rei McCully v. City of North Richland Hills*

    406 F.3d 375, 383 (5th Cir. 2005) ..................................................................43

*Gonzalez v. Huerta*

    826 F.3d 854, 858 (5th Cir. 2016) ..................................................................21

*Harlow v. Fitzgerald*

    457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)....................................20

*Hicks-Fields v. Harris Cnty.*

    860 F.3d 803, 808 (5th Cir. 2017) .............................................................42,43

*Higginbotham v. City of New York*

    105 F. Supp. 3d 369, 381 (S.D.N.Y. 2015) ....................................................41

*Hope v. Pelzer*

    536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)....................................41

*Hutcheson v. Dall. Cty.*

    994 F.3d 477, 482 (5th Cir. 2021) ..................................................................44

*Illinois v. Gates*

    462 U. S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)....................................23

*Illinois v. Wardlow*

    528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 576 (2000)........................34

*INS v. Delgado*

    466 U.S. 210, 217, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)....................................28

*Kaley v. United States*

    571 U. S. 320, 338, 134 S. Ct. 1090, 1103, 188 L. Ed. 2d 46, 62 (2014)....................23

*Kokesh v. Curlee*

    14 F. 4th 382, 397-398 (5th Cir. 2021)..........................................................12

*Malbrough v. Stelly*

    814 F. App'x 798, 806 (5th Cir. 2020)......................................................32,42

*Malley v. Briggs*

    475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)....................................21

*Maryland v. Wilson*

    519 U.S. 408, 413-14, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, 47-48 (1997) ...........16,41

*McConney v. City of Houston*

    863 F.2d 1180, 1184 (5th Cir. 1989) ...............................................................43

*Mejia v. Lafayette Consol. Gov't*

    2024 U.S. Dist. LEXIS 199262, at *9 (W.D. La. Sep. 26, 2024) .................................43

*Michigan v. DeFillippo*

    443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343, 348-49 (1979).......................26

*Michigan v. Long*

    463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481(1983)......................................15,16,30,41

*Monell v. Dep't of Social Servs.*

    436 U.S. 658, 691-94 (1978) ...................................................................42,43

*Morgan v. Swanson*

    659 F.3d 359, 371 (5th Cir. 2011) .................................................................21

*Myers v. James*

    2004 U.S. Dist. LEXIS 24385, at *18 (E.D. La. Nov. 26, 2004)..................................39

*Peña v. City of Rio Grande City*

    879 F.3d 613, 622 (5th Cir. 2018)..................................................................43

*Penney v. Wolsey*

    2008 U.S. Dist. LEXIS 121720, at *4 (S.D. Tex. June 3, 2008)..............................18,38

*Pennsylvania v. Mimms*

    434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)...........................................3

*Peterson v. City of Fort Worth, Tex.*

    588 F.3d 838, 851 (5th Cir. 2009)..................................................................43

*Piotrowski v. City of Houston*

    237 F.3d at 579 (5th Cir. 2001)....................................................................45

*Ratliff v. Aransas Cty.*

    948 F.3d 281, 285 (5th Cir. 2020)..................................................................43

*Riley v. Wava H. Budden*

    2005-1752  (La. App. 1 Cir. 02/14/07); 949 So.2d 677 ..............................................25

*Robinson v. Midland Cty.*

    80 F.4th 704, 709 (5th Cir. 2023)..................................................................19

iv

*Rosales v. Bradshaw*

    72 F.4th 1145, 1147 (10th Cir. 2023) ......................................................................10,11

*Sandberg v. Englewood, Colorado*

    727 F. App'x 950, 963 (10th Cir. 2018)........................................................................40

*Scott v. Harris*

    550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)...............................20

*State v. Davis*

    09-452 (La. App. 5 Cir. 01/26/10); 31 So. 3d 513, 517 ...............................................36

*State v. Lopez*

    00-0562 (La. 10/30/00); 772 So.2d 90, 92-93 ............................................................26

*State v. Turner*

    12-855 (La. App. 5 Cir. 05/16/13); 118 So. 3d 1186, 119.......................................25,27

*State v. Williams*

    13-732 (La. App. 5 Cir. 03/26/14); 138 So. 3d 727, 728 .............................................24

*Terrell v. Town of Woodworth*

    2024 U.S. App. LEXIS 3803, at *12-13 (5th Cir. Feb. 19, 2024) ................................20

*Terry v. Ohio*

    392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).....................13,14,19,23,30,31,41

*Tucker v. City of Shreveport*

    998 F.3d 165, 170.......................................................................................................20

*Turner v. Lieutenant Driver*

    814 F. 3d 678 (5th Cir. 2017).......................................................................................39

*United States v. Alvarez*

    837 F. App'x 296, 299 (5th Cir. 2020).....................................................................29,36

*United States v. Andres*

    703 F.3d 828, 834 (5th Cir. 2013)...............................................................................35

*United States v. Brigham*

    382 F.3d 500, 509 (5th Cir. 2004).......................................................................17,27,35,38

*United States v. Brown*

    209 F. App'x 450, 452 (5th Cir. 2006).....................................................................14,30

v

*United States v. Coker*

    2014 U.S. Dist. LEXIS 83743, at *41 (E.D. Tenn. Jan. 6, 2014) ........................3,15,30

*United States v. Davies*

    768 F.2d 893 (7th Cir. 1985)......................................................................................27

*United States v. Hardy*

    855 F.2d 753 (11th Cir. 1988) ..................................................................................27

*United States v. Henry*

    372 F.3d 714, 716 (5th Cir. 2004)............................................................................14

*United States v. Hensley*

    469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985).....................................31

*United States v. Lopez-Moreno*

    420 F.3d 420, 430 (5th Cir. 2005).............................................................................23

*United States v. Marquez-Diaz*

    325 F. App'x 637, 645-46 (10th Cir. 2009) ...............................................................15

*United States v. Murphy*

    2024 U.S. App. LEXIS 9830, at *2 (5th Cir. Apr. 23, 2024) .....................................14

*United States v. Reyes*

    349 F.3d 219, 225 (5th Cir. 2003)........................................................................15,32

*United States v. Shaffer*

    781 F. App'x 404, 415 (6th Cir. 2019)......................................................................29

*United States v. Sharpe*

    470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985)................17,27

United States v. Smith

    952 F.3d 642, 647 (5th Cir. 2020)........................................................................13,18

*United States v. Sokolow*

    490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)............................................28

*United States v. Walker*

    49 F.4th 903, 906-07 (5th Cir. 2022) ........................................................................23

*United States v. Wallen*

    388 F.3d 161, 166 (5th Cir. 2004)................................................................16,29,30,32

*United States v. Wise*

> 877 F.3d 209, 223 (5th Cir. 2017) ..........................................................................15,32

*U.S. v. Richards*

> 500 F.2d 1025 (9th Cir. 1974) ..............................................................................28

*Vincent v. City of Sulphur*

> 805 F.3d 543, 547 (5th Cir. 2015) ..........................................................................21

*Wainwright v. Woodward*

> 2022 U.S. Dist. LEXIS 62976, at *5-6 (W.D. La. Mar. 18, 2022) ..............................25

*Waller v. Hanlon*

> 922 F.3d 590, 599 (5th Cir. 2019) ..........................................................................19

*Ward v. Rock Against Racism*

> 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) ..................................40

*Webb v. Arbuckle*

> 2011 U.S. Dist. LEXIS 28259, at *17 (W.D. La. Mar. 18, 2011) ......................13,34,36

*Whren v. United States*

> 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ......................18,23,26,25,26,35

*Windham v. Harris Cnty., Texas*

> 875 F.3d 229 (5th Cir. 2017) ..................................................................................27

## **STATUTES**

Federal Rule of Civil Procedure article 12(c) ...........................................................19

La. C. C. Proc. Art. 215.1(D) ................................................................................17,26

La. R. S. 32:52 ......................................................................................................26

La. R. S. 32:57 ......................................................................................................26

La. R. S. 32:104(B) .............................................................................................2,24,25

La. R. S. 32:104(D) .............................................................................................2,24

La. R. S. 32:402 ....................................................................................................26

La. R. S. 32:404 ................................................................................................17,25,26

La. R. S. 32:427 ....................................................................................................26

La. R. S. 32:1310 ..................................................................................................26

La. R. S. 40:1379 ................................................................................................28,31,36

La. R. S. 47:511(A)........................................................................................................26

La. R. S. 47:513 ...............................................................................................3,17,25,33

La. R. S. 47:516 .............................................................................................................26

Defendants, Officer Samuel Terrell, Former Chief Ronney Howard and the City of Alexandria file th[1]is Memorandum in Support of Motion for Judgment on the Pleadings.

## I.      BACKGROUND

Plaintiffs, Mario Rosales and Gracie Lasyone, filed this §1983 action on November 1, 2022 against Officer Jim Lewis, Officer Samuel Terrell, former Chief of Police Ronney Howard and the City of Alexandria.  ECF No. 1.

Plaintiffs alleged: (1) violations of the Fourth Amendment, for unreasonable seizure in detaining Mario Rosales and Gracie Lasyone without reasonable suspicion of criminal activity,[2] (2) violations of the Fourth Amendment, for unreasonable seizure in expanding a traffic stop's duration and scope without reasonable suspicion,[3] (3) violations of the Fourth Amendment, for unreasonable searches brought by Mario Rosales against Officers Lewis and Terrell in their individual capacities,[4] (4) violation of the First Amendment right to record to the police brought by Mario Rosales and Gracie Lasyone against Officers Lewis and Terrell in their individual capacities,[5] (5) violations of the Fourth Amendment, for unreasonable seizures brought by Mario Rosales and Gracie Lasyone against Officers Lewis and Terrell and former Chief Howard in their official capacities and the City of Alexandria, Louisiana,[6] and (6) violations of the First Amendment right to record police brought by plaintiffs against Officers Lewis and Terrell, and Chief Howard in their official capacities and the City of Alexandria, Louisiana.[7]

---

[1]

[2] ECF No. 1 at p. 30.
[3] ECF No. 1 at p. 31.
[4] ECF No. 1 at p. 33.
[5] ECF No. 1 at p. 34.
[6] ECF No. 1 at p. 35.
[7] ECF No. 1 at p. 37.

A scheduling order was issued by the court setting the deadlines for amendment to the pleadings as July 7, 2023.[8]  ECF No. 22 at p. 3. An amending complaint was never filed by plaintiffs, and the deadline to amend the complaint had passed even before a stay order was issued.[9]

As a threshold matter, the plaintiffs' complaint is replete with links to, *inter alia,* body camera footage of Officers Lewis and Terrell, as well as dash camera footage with hyperlinks of the video uploaded to youtube by the plaintiffs.  ECF No. 1 at p.7.  Additionally, the plaintiffs' complaint contains still shots from the videos.  ECF No. 1 at pp. 7, 10, 12, 13, 14, 19, 24, 27. Even more, plaintiffs' allegations in their complaint are utterly discredited by the video footage. Since these videos uploaded to youtube by the plaintiffs are arguably not as clear as the original videos, the undersigned has attached by manual attachment the original videos for the court to view as well.  (Exhibit "A").

## II.    SUMMARY OF THE FACTS

At the outset of the video footage, it shows Mario Rosales's red Mustang drift from the right lane to the left lane on Jackson Street Extension after turning onto Jackson Street Extension, and Mario Rosales failed to use his turn signal when shifting from the right to left lane.  This is a violation of Louisiana Revised Statute 32:104(D).  Then, Mario Rosales failed to give a signal of his intent to make a left turn *at least 100 feet* before the intersection as mandated by La. R.S. 32:104(B).  Therefore, the stop was justified at its inception.

---

[8] While another order was signed amending deadlines, the amendment of the pleadings deadline remained the same.  ECF No. 27. *Compare* ECF No. 22 at p. 3.

[9] After July 7, 2023, on September 22, 2023 a Motion to Stay was filed by Officer Jim Lewis.  ECF No. 34.  An order granted the stay on October 2, 2023.  ECF No. 36.  On October 13, 2023, plaintiffs filed a Motion for Reconsideration of Stay Order.  ECF No. 39.  On August 19, 2024, this court issued a memorandum order granting the plaintiffs' motion and lifted the stay.  ECF No. 52.

2

Beyond that, as discussed i*nfra,* Rosales had been living in Louisiana over thirty (30) days yet had not registered his vehicle with "New Mexico" license plates with the state of Louisiana in violation of Louisiana Revised Statute 47:513.[10]

Curiously, at the very beginning of the traffic stop, Rosales first statement to Officer Terrell is: "**All right now I'm getting agitated**."[11]

Moreover, Mario Rosales never notified officers he had a firearm in the car, until asked by Officer Lewis.  Indeed, Officer Lewis was prompted to ask about firearms only after he spotted highly lethal critical defense ammunition, also known as jacketed hollow point ammunition, in the open glove box of Mario Rosales's Mustang on the passenger side.

Undeniably, Officer Lewis and Officer Terrell had to ensure their safety through questions about weapons, by ordering the passenger, Gracie Lasyone, out of the vehicle when it contained a firearm and highly lethal ammunition, and perform pat-downs.  This did not unduly prolong the *Terry* stop since officer safety and that of the public is paramount during traffic stops which are fraught with danger.[12]

Here, Officer Lewis asked Mario Rosales, "Hey, can I have your permission to retrieve that firearm out of your gun, or out of your uh vehicle?"[13]

Mario Rosales answered, "**No, I don't want anybody searching my vehicle**."[14]

---

[10] ECF. No. 1 at p. 28 at fn. 3.

[11] *See* Manual Attachment A-3, Officer Terrell Body Camera at 0:01-0:04.

[12] "[Q]uestions directed toward officer safety, such as inquiring about dangerous weapons, do not unconstitutionally extend the stop." *United States v. Coker*, 2014 U.S. Dist. LEXIS 83743, at *41 (E.D. Tenn. Jan. 6, 2014).  The Supreme Court has emphasized that "the safety of the officer" during a traffic stop is a "legitimate and weighty" interest. *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977).  Therefore, critically, questions directed toward officer safety, Officer Lewis requesting if he could remove the firearm from the vehicle during the stop (which Rosales, the plaintiff, flatly refused) and the time for the pat down should not unconstitutionally extend the stop.

[13]  ECF No. 1 at ¶59.  ECF No. 1 at p. 7.  Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

[14] ECF No. 1 at ¶60.   Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

3

"Okay, cool. Yeah, I get it," said Officer Lewis.[15]

(Emphasis added).

Further, Rosales, wearing baggy clothing, consensually agreed to emptying of pockets after being asked.[16]  This did not unduly extend the stop and should not count as part of the time period of the *Terry* stop, since the officers were ensuring their own safety and that of the public.

Officer Lewis advised Rosales that any time Rosales was not comfortable with one of his questions, Rosales could say "pass."[17]  Notably, Rosales never said "pass" and willingly, answered the officers' questions, albeit many times vaguely and indirectly.  Similarly, Officer Terrell informed Gracie Lasyone that she could say "pass" if she did not desire to answer questions also.[18]

At only approximately three minutes into the traffic stop when Rosales was asked how long he had been in the state of Louisiana, he responded to Officer Lewis, "**It's off and on**."[19]  He explained he was trying to obtain residency in Louisiana, and he worked in Alexandria.[20]  He also stated he was trying to buy a home in Alexandria.[21]  Then, when Officer Lewis asked how long Rosales had been in the state of Louisiana, Rosales paused and tilted his head as if pondering the answer.

Rosales then stated, "Whenever I first started coming here it would have been October."[22]  Rosales then stated in an unsure voice he returns to New Mexico every once in a while.[23]  Officer

---

[15] ECF No. 1 at ¶61.  Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

[16] *See* Manual Attachment A-2, Officer Lewis Body Camera at 3:13-3:27.

[17] *Id.* at 2:40-2:50.

[18] *See* Manual Attachment A-3, Officer Terrell Body Camera at 3:40-3:52.

[19] *See* Manual Attachment A-2, Officer Lewis Body Camera at 2:49-2:54.

[20] *Id.* at 2:54-3:09.

[21] *Id.*

[22] *Id.* at 5:00-5:15.

[23] *Id.* at 5:15-5:25.

Lewis still trying to determine his residency pointedly asked, "Where do you live?"[24]  Rosales responded, "Dry Prong."[25]  Then, curiously, Rosales stated in order for him to change his address he needed to get proof of residency.[26]  Curiously, Rosales digressed stating he was trying to "swap over [his] bank statements."[27]

After, when Officer Lewis directly asked if Rosales still had a New Mexico driver's license, Rosales pointed to him and stated "you have it" (implying the driver's license) without answering the question.  Officer Lewis stated, he did not have Rosales's driver's license that Officer Terrell had it.[28]

Needless to say, it was odd that Rosales was not giving straight forward answers to direct questions.  Then, Rosales admitted he still had a New Mexico driver's license despite living in Louisiana.[29]

Strangely, Rosales then seemed to have trouble recalling when the last time he had been to New Mexico – even though he later admitted, "*it was not even a couple of weeks ago.*"[30]  After, Rosales could not seem to recall how long he stayed in New Mexico the last time he visited even though it was not that long before.[31]  In fact, the inside of his Mustang looked lived-in when viewing it through Officer Lewis's body worn camera footage.

Gracie Lasyone, while being questioned separately, was asked where Mario Rosales lived, and she stated Rosales was "from Roswell [New Mexico] and ***comes back and forth***."[32]

---

[24] *Id.* at 5:25-5:30.
[25] *Id.*
[26] *Id.*  at 5:30-5:45.
[27] *Id.*
[28] *Id.*  at 5:45-6:19.
[29] *Id.* at 6:19-6:20.
[30] *Id.* at 6:20-6:26.
[31] *Id.* at 6:26-6:46.
[32] *See* Manual Attachment  A-3, Officer Terrell Body Camera at 4:22 -4:28.

Undoubtedly, this piqued officers' interest in travel to and from border states which are often along drug corridors.

Yet, Lasyone had also stated Rosales worked in Alexandria, Louisiana at Atlas Home Services. It seemed odd for Rosales to have a steady job in Alexandria, Louisiana, yet he was going back to New Mexico and staying in New Mexico weeks at a time notwithstanding his job in Alexandria, Louisiana at Atlas Home Services.

When asked how often Rosales made the trip from New Mexico to Louisiana, Lasyone hesitated and stated, "Every few months *maybe.*"[33] She also stated he would stay in New Mexico a few weeks to a month when he went, despite his employment in Alexandria. Indeed, these discrepancies and their answers were strange.

Moreover, the plaintiffs gave inconsistent answers pertaining to their trip's itinerary. For instance, at first, Mario Rosales seemed to forget he had made a trip to the bank, after leaving work, before being stopped but then corrected himself. At first, he stated, "Right now, I'm heading to the bank" yet, he pointed in the direction in which he had already travelled past just moments before being pulled over.[34] Then, he changed his answer and stated, "Actually, I hit the bank."[35]

Surprisingly, when Gracie Lasyone, was questioned separately she stated they had just left work; however, she did not even mention a trip to the bank.

Curiously, she only corrected herself as to this inconsistency once Officer Lewis asked her again quizzically after recognizing the contradictory statements between Rosales, the driver, and Lasyone, the passenger.[36]

---

[33] *See* Manual Attachment A-3, Officer Terrell Body Camera at 4:30-4:37.
[34] *Id.* at 6:46-7:16.
[35] *Id.* at 7:15-7:18.
[36] *See* Manual Attachment A-2, Officer Lewis Body Camera at 8:30-8:55.

When the passenger, Lasyone, was asked whether there was anything illegal in the vehicle, she responded, "Not to my knowledge."[37]  Officer Terrell noted aloud she *hesitated* when answering the question.[38]

At one point, Lasyone pointedly asked Officer Terrell, "Is there a reason for these questions?"[39]  She asked, "Why?" to Officer Terrell.[40]  This would not be the first time, Lasyone would ask the officers "Why?" during the traffic stop.

She then asked why Officer Lewis was asking Rosales questions, and retorted, "Do you just pull people over because you are curious?"[41]  Officer Terrell, in a very cordial voice responded that Rosales was pulled over due to his failure to signal according to Louisiana law.

Moreover, the plaintiffs repeatedly made reference during the traffic stop that they wanted Gracie Lasyone to be able to retrieve her cell phone from the Mustang so she could record the traffic stop even though Rosales's Mustang contained highly lethal critical defense ammunition also known as "jacketed hollow point" ammunition and a firearm in the Mustang.

In fact, Rosales stated, as Lasyone listened, during the *Terry* stop, "I'd feel a lot safer, if she had her phone and she would be able to record while you checked me [for weapons]."[42]  Then, Officer Lewis signaled to his body camera noting the encounter was all being recorded.  Rosales retorted, that is what happened last time, and the officer lost [the body camera], and it ended in a lawsuit.[43]  Officer Lewis promised Rosales his body camera footage would not be lost.[44]

---

[37] *See* Manual Attachment A-3, Officer Terrell Body Camera at 3:52-4:01.
[38] *Id.*
[39] *Id.* at 5:13-5:15.
[40] *Id.* at 5:15-5:34.
[41] *Id.*
[42] *See* Manual Attachment A-2, Officer Lewis Body Camera at 3:40-3:45.
[43] *Id.* at 3:45-3:54.
[44] *Id.* at 3:54-4:01.

Even more, at six minutes into the traffic stop, Lasyone once again then asked Officer Terrell, if she could "just grab" her phone out of the vehicle even though there was a firearm in the vehicle.[45]  Again, Officer Terrell explained his body camera was recording everything.  Officer Terrell patiently explained, "I'll put your mind at ease, [and pointed to his body camera] this is public record."[46]  He further pointed to Lewis's body camera, and calmly explained she could get the recordings from the Alexandria Police Department -- which plaintiffs ultimately did.

Later, Rosales tried to argue with Officer Lewis stating Lasyone was not part of the officers' investigation, and Lasyone again requested to retrieve her phone out of the vehicle while a firearm and ammunition was in Rosales's vehicle.[47]  Officer Lewis explained to Rosales that the reason Lasyone was not allowed to go back to the vehicle to retrieve her phone was due to the fact, *by Rosales's own admission,* there was a firearm in the vehicle.[48]  Then, Lasyone retorted, "Why?" to which Officer Lewis again had to explain to the plaintiffs the situation to which Lasyone shook her head no in disbelief, seemingly unaware or oblivious to concerns of officer safety.[49]

Lasyone told Officer Terrell, "we've just had bad experiences [with police]."[50]  When Officer Terrell inquired about what bad experiences, Lasyone pointed to Rosales and said it was Rosales's own business, and she would not elaborate further.[51]  Unquestionably, this piqued the officers' interest if there were prior arrests or convictions of Rosales and Lasyone, and if this was a situation where a felon was in possession of a firearm.

---

[45] *See* Manual Attachment A-3, Officer Terrell Body Camera at 6:20-6:36.
[46] *Id.* at 6:36-7:06
[47] *See* Manual Attachment A-2, Officer Lewis Body Camera at 10:38-10:48.
[48] *Id.* at 10:48-11:36.
[49] *Id.*
[50] *See* Manual Attachment A-3, Officer Terrell Body Camera at 6:25-6:35.
[51] *Id.* at 6:25-6:35.

By eleven (11) minutes into the *Terry* stop, Officer Terrell was writing the traffic ticket and running license, registration, and computer checks through dispatch. After the checks came back clear, at approximately eighteen (18) and a half minutes, the traffic citation was completed, then, Officer Terrell was handing Rosales a ticket.[52]

At twenty (20) minutes, Rosales stated he had questions for Officer Terrell and Officer Lewis requesting their badge numbers and asked who he would contact to obtain the video footage, to which the officers responded respectfully answering all of his questions in full in a cordial manner.[53] Officer Terrell then stated, "Have a good day, sir."[54]

Undoubtedly, there were other oddities related to plaintiffs' statements. For instance, as noted *supra,* both Lasyone and Rosales's references to prior "bad experiences" with law enforcement without elaborating when asked, piqued the officers' interests. The plaintiffs' less than forthcoming answers raised more concerns and suspicions for the officers.

Indeed, at all times, Officers Lewis and Terrell were professional and courteous to the plaintiffs. In fact, Officer Lewis said after the traffic citation was handed to Rosales, "Hopefully, this is a better experience than you had before [with law enforcement]."[55]

Rosales emphatically stated, "Not quite- not quite!" Then, Rosales exclaimed, "It's almost very similar!"[56]

Officer Lewis asked nicely, "Have we been fair with you?"

Rosales again being vague stated, "I mean – that's not hear to discuss."[57]

---

[52] *See* Manual Attachment A-3, Officer Terrell Body Camera at 18:30-19:00.
[53] *Id.* at 20:08-20:53.
[54] *Id.*
[55] *See* Manual Attachment A-2, Officer Lewis Body Camera at 20:16-20:19.
[56] *Id.* at 20:19-20:24.
[57] *Id.* at 20:24-20:37.

Yet, a search of the public records makes clear Rosales previous encounter with law enforcement in New Mexico was a far cry from what occurred here. *See Rosales v. Bradshaw*, 72 F.4th 1145, 1147 (10th Cir. 2023).  In that case originating in New Mexico, plaintiff, Mario Rosales, passed a pickup truck which belonged to Bradshaw, an off-duty, out-of-uniform sheriff's deputy. 72 F.4th 1145, 1148.  In response to being legally passed and with his child in the front passenger seat, Bradshaw decided to follow Rosales. *Id.*  Having noticed that he was being followed by an unmarked pickup truck, Rosales made a series of turns *without signaling to confirm as much*; Bradshaw's pickup continued to follow him.  *Id.*  Ultimately, Bradshaw (known for his volatile temper) followed Rosales home and blocked Rosales in his driveway. Rosales exited his vehicle legally displaying his handgun.  "Bradshaw immediately started yelling and cursing at . . . Rosales in a loud, threatening, and abusive manner."  *Id.* at 1149.  At some point during this exchange, Bradshaw pulled out a gun, held it in his hand, and "point[ed] it at Rosales in a threatening manner."  *Id.*

While Rosales claimed to Officers Terrell and Lewis that this traffic stop was "quite similar" to his lawsuit with Bradshaw in New Mexico – nothing could be further from the truth.

At no point in Rosales's encounter with Officers Lewis and Terrell did they ever threaten or act abusively toward Rosales or Lasyone, as shown by the body worn camera footage.  Plainly, neither Officer Lewis nor Terrell ever pointed a firearm at Rosales or Lasyone, as off-duty Bradshaw had.  In fact, while asking questions to Rosales and Lasyone, Officers Lewis and Terrell informed Rosales and Lasyone that they could say "pass" to the questions, and informed them they had a Fifth Amendment right.

Therefore, Rosales comparison of this *Terry* traffic stop by Officers Terrell and Lewis to what occurred to him in New Mexico with off-duty Bradshaw is drastically different, and Rosales

allegation that this *Terry* traffic stop is "very similar" to what occurred in *Rosales v. Bradshaw*, 72 F.4th 1145, 1147 (10th Cir. 2023) is simply false.

Even more, the officers questioned the truthfulness of the plaintiffs' answers given their hesitancy to answer direct questions, their inconsistencies and given the fact that some of their stories seemed implausible.  For instance, having a job as a mechanic at Atlas Home Services in Alexandria, but being able to leave for New Mexico for weeks at a time – does not seem conducive with holding down a job in Alexandria, Louisiana.

Beyond that, during the traffic stop, Rosales seemingly referred to *Rosales v. Bradshaw*, 72 F.4th 1145, 1147 (10th Cir. 2023) claiming to Officer Lewis, when urging him to allow Lasyone to retrieve her cellphone out of the Mustang with the firearm to record the traffic stop, stated in his lawsuit out of New Mexico, off-duty Bradshaw lost his body camera footage, and that is why he had that lawsuit against Bradshaw.[58]

Yet, from a reading of *Rosales v. Bradshaw*, 72 F.4th 1145, 1147 (10th Cir. 2023), Bradshaw was off-duty in his own pick up truck dressed in plain clothes.  Therefore, this is yet another statement by Rosales that is seemingly untruthful upon a reading of that case, since it would be highly unlikely that an off-duty, plain-clothed officer in his private vehicle would be wearing a body camera when he was not in uniform and off-duty.

Even more, it appears at only three (3) minutes into the *Terry* traffic stop at issue here, Rosales was already considering a lawsuit, making his first request for Lasyone to video everything.[59]  After that, Lasyone requests if she could just grab her phone.[60]  Indeed, at ten (10) minutes in the *Terry* traffic stop, Rosales complains Lasyone is not part of the traffic stop and

---

[58] *See* Manual Attachment A-2, Officer Lewis Body Camera at 3:40-4:02.
[59] *Id.* at 3:42.
[60] *See* Manual Attachment A-3, Officer Terrell Body Camera at 3:04-3:08.

11

should be able to video it, and should be able to retrieve her phone out of the vehicle with firearms in it.[61]  Likewise, Lasyone complains and questions Officer Lewis, after he explains, she cannot retrieve her phone in the vehicle when there is a firearm in the vehicle.[62]  To add to this, Officers Lewis and Terrell had to repeatedly reassure plaintiffs that the whole traffic stop was being recorded by their own body cameras and dash camera, that it was all public record, and explained to them how they could obtain the video footage -- even going so far as giving them the address to the police department at the end of the traffic stop, as shown by Officer Terrell's body worn camera footage.

As the Fifth Circuit has stated, "**The Fourth Amendment and 42 U.S.C. §1983 should not be employed as a daily quiz tendered by videotaping hopefuls seeking to metamorphosize the law enforcement officers from investigators and protectors, into mere spectators, and then further converting them into federal defendants**." _Kokesh v. Curlee_, 14 F. 4th 382, 397-398 (5th Cir. 2021).  (Emphasis added).

Even more, under "Injury to Plaintiffs" in the Plaintiffs' Complaint, Rosales complains he is still "[u]nsettled by the officers' conduct" in the case _sub judice_, to the point he has "not driven his red Mustang since that day."  ECF No. 1 at ¶246.  He further states, "The vehicle needed a new battery from lack of use, and because Mario [Rosales] has to use one of his other vehicles for transportation, he has lost the option to sell that vehicle."  _Id._

This allegation presupposes to this Court that Mario Rosales does not know how to change a battery in his red Mustang.  Yet, during his answers to questions to Officer Lewis

---

[61] _See_ Manual Attachment A-2, Officer Lewis Body Camera at 10:35-11:37.
[62] _Id._

during the *Terry* stop, he stated, "I work on cars."[63]  In fact, he stated he was heading to Bunkie to pick up a car part after the traffic stop to work on a vehicle.[64]

Despite being a mechanic, the camera footage appears to show that Mario Rosales hands appeared clean even after just leaving work from Atlas Home Services where he worked on generators.  All of these factors, which may seemingly look innocent when viewed in isolation, taken collectively amounted to reasonable suspicion.

Moreover, plaintiffs' own answers and conduct contributed to the length of the stop.

## III.    SUMMARY OF THE ARGUMENT

The legality of traffic stops for Fourth Amendment purposes is guided by the Supreme Court's analysis in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  First, the Court determines whether the stop was justified at its inception.

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  <u>United States v. Smith</u>, 952 F.3d 642, 647 (5th Cir. 2020).  (Citations omitted).  Here, there was a traffic violation under the plain letter of Louisiana law, as discussed *infra*.

Moreover, if "additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."  <u>Webb v. Arbuckle</u>, 2011 U.S. Dist. LEXIS 28259, at *17 (W.D. La. Mar. 18, 2011).

---

[63] *See* Manual Attachment A-2, Officer Lewis Body Camera at 7:18-7:13.  Even Gracie Lasyone admitted Rosales was a "mechanic."*See* Manual Attachment A-3, Officer Terrell Body Camera at 5:46-5:54.
[64] *Id.*

Plaintiffs allege that the officers unreasonably prolonged the stop to frisk Rosales for weapons "when the officers lacked reasonable suspicion that he was both armed and dangerous." ECF No. 1 at ¶¶257, 264. These allegations are preposterous given the fact that highly lethal jacketed hollow point bullets were in plain view in the glove compartment of the red Mustang and by Rosales's own admission there was a firearm in his Mustang's backseat. After all, since 1968, under _Terry v. Ohio_, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), an officer conducting an investigatory stop may pat down a suspect for weapons if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." _See also United States v. Murphy_, 2024 U.S. App. LEXIS 9830, at *2 (5th Cir. Apr. 23, 2024).

At its core, "For purposes of a Terry pat-down, 'the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" _United States v. Brown_, 209 F. App'x 450, 452 (5th Cir. 2006). Simply put, after seeing highly lethal ammunition in the Mustang, as well as, being told a firearm was in the Mustang, a reasonably prudent man would be warranted in their belief that their safety or that of others was in danger.

Moreover, the videos clearly show Mario Rosales wearing baggy clothing[65] which could easily conceal a weapon. Even more, the video footage repeatedly shows Rosales leaning on the hood of patrol vehicle, to the point where Officer Lewis had to request Rosales "face me"[66] when answering questions of Officer Lewis.

---

[65] Baggy clothing may be one reason to justify a pat down. _United States v. Henry_, 372 F.3d 714, 716 (5th Cir. 2004).
[66] _See_ Manual Attachment A-2, Officer Lewis Body Camera footage 4:03-4:09.

14

Moreover, Rosales's own statements including unrelated topics such as "bank statements," "the economy," and his "lawsuit" against another law enforcement officer prolonged the traffic stop to which he complains.  *See United States v. Marquez-Diaz*, 325 F. App'x 637, 645-46 (10th Cir. 2009)(evolving suspicion included suspect speaking to officer of unrelated topics and leaned on the hood of a patrol car).

Plaintiffs allege in their complaint, "The officers also unreasonably prolonged the stop to search Mario's pockets without a warrant and without lawfully arresting Mario [Rosales]."  ECF No. 1 at  ¶258.  Further, the plaintiffs alleged the officers "lacked a warrant to search Mario's pockets and did not arrest him."  ECF No. 1 at  ¶264-265.  Yet, since 2003 (over twenty (20) years ago), the Fifth Circuit held, officers may request that a suspect empty his pockets and lift his shirt, and this is permissible under *Terry*.  *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003).  Even more, when Officer Lewis asked if Rosales would empty his pockets, Rosales consensually complied. *See United States v. Wise*, 877 F.3d 209, 223 (5th Cir. 2017).

Furthermore, "questions directed toward officer safety, such as inquiring about dangerous weapons, do not unconstitutionally extend the stop" as plaintiffs have incorrectly alleged here. *United States v. Coker*, 2014 U.S. Dist. LEXIS 83743, at *41-42 (E.D. Tenn. Jan. 6, 2014).  The same should hold true for a pat-down and emptying pockets.  After all, the United States Supreme Court has held, "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481(1983).

Indeed, it was only after Officer Lewis spotted the highly lethal ammunition in the glove box of the Mustang, right in front of Lasyone, that she was ordered out of the vehicle.  Tellingly,

15

approximately 27 years ago, the United States Supreme Court held that a passenger can be ordered out of a vehicle just as a driver during a traffic stop in _Maryland v. Wilson_:

> "[A]s a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. **Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.**"

519 U.S. 408, 413-14, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, 47-48 (1997).  (Emphasis added).

Similarly, in _Michigan v. Long_, the United States Supreme Court was concerned a "suspect [in a Terry stop] may be permitted to reenter the vehicle before the _Terry_ investigation is over, and again, may have access to weapons."  463 U.S. 1032, 1052.

Thus, Rosales and Lasyone unduly prolonged the stop themselves when they repeatedly and unreasonably asked for Lasyone to obtain her cellphone from Rosales's Mustang so she could record the traffic stop, when there was highly lethal ammunition and a firearm in the Mustang.

Importantly, "[T]he fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer."  _United States v. Wallen_, 388 F.3d 161, 166 (5th Cir. 2004)

 Beyond that, the officers had to take time out, over and over, during the traffic stop to reassure the plaintiffs that the traffic stop was being recorded by the officers' own body cameras, that the officers would not lose the body camera footage and that they could obtain the body camera footage after the traffic stop since it was public record – with the officers even explaining to them at the end how the plaintiffs could go about obtaining the footage from the Alexandria

16

Police Department.  Simply put, the plaintiffs' own actions, repeated unreasonable requests, and strange, implausible and inconsistent answers are what prolonged the traffic stop.

The plaintiffs oversimplify this matter to a "21 minute" *Terry* stop,[67] but fail to take into account the plaintiffs' own actions, unusual, indirect statements, implausible explanations and unreasonable requests during the traffic stop which added to the delay.  Even more, eleven (11) minutes into the traffic stop, computer checks were being run.  Notably, officers are not required to initiate routine checks before asking basic questions.[68]

The United States Supreme Court has held, "our cases impose no rigid time limitation on Terry stops."  *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985).

Indeed, the plaintiffs' strange, vague answers pertaining to the residence/address of Rosales provided more reasonable suspicion of legal wrongdoing.  *See* La. R.S. 47:513[69] (when Rosales failed to register his vehicle in the state of Louisiana after living in Louisiana for thirty (30) days, it was a violation of Louisiana law).   Furthermore, Rosales was in violation of Louisiana Revised Statute  47:501 given he had been in Louisiana (over 90 days) since October[70] and had his residence in Louisiana at the time of traffic stop on June 15, 2022.[71]   ECF No. 1 at p. 28 at fn. 3.

Indeed, a perceived unwillingness by a driver to verify his address can support reasonable suspicion.  *See Cunningham v. Panola Cty.*, 2011 U.S. Dist. LEXIS 57850, at *22 (E.D. Tex.

---

[67] ECF No. 1 at ¶235.
[68] *United States v. Brigham,* 382 F.3d 500, 509 (5th Cir. 2004).
[69] ECF No. 1 at p. 28 at fn. 3.
[70] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 5:00-5:12.  *See also* Manual Attachment, Exhibit A-2.
[71] Notably, Louisiana Code of Criminal Procedure article 215.1(D) provides in pertinent part, "nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950."

May 8, 2011) ("Cunningham also refused to answer questions regarding his address, stating instead that the Officers had his license and the address is printed on it" and "answering questions with questions of his own").  *See also* <u>Penney v. Wolsey</u>, 2008 U.S. Dist. LEXIS 121720, at *4 (S.D. Tex. June 3, 2008) (Plaintiff stated that he had lived in Washington for four years "off and on," but he was not normally there because he was usually in Canada or California added to reasonable suspicion).

Notably, "Reasonable suspicion is a low threshold" and requires only "some minimal level of objective justification."  <u>United States v. Smith</u>, 952 F.3d 642, 648 (5th Cir. 2020).  Our inquiry views "the totality of the circumstances and the collective knowledge and experience of the officer."  *Id.*  Implausible stories and inconsistent statements can provide reasonable suspicion to conduct further investigation.  *Id.* at 649.

Here, when asked how often Rosales made the trip from New Mexico to Louisiana, Lasyone hesitated and stated, "Every few months *maybe.*"[72] She also stated he would stay in New Mexico a few weeks to a "month" when he went, despite having a job in Alexandria.  Indeed, these discrepancies and their answers were odd and are arguably suggestive of a drug mule crossing border states.

Yet, plaintiffs complain that the officers asked questions about drugs.  However, the mere fact that an officer's motivation may have been to investigate drug trafficking, rather than enforce traffic laws is irrelevant to the constitutional question.  *See* <u>Whren v. United States</u>, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (1996).

Taken collectively, Rosales's agitation, the inconsistencies between Rosales's story regarding going to the bank, when Lasyone failed to disclose this to Officer Lewis, until he questioned her

---

[72] *See* Manual Attachment A-3, Officer Terrell Body Camera at 4:30-4:37.

again on this inconsistency, the implausible story that he worked in Alexandria, yet was "off and on" in Louisiana and sometimes went to New Mexico for weeks at a time and sometimes up to a month, Lasyone's pattern of answering questions with questions, the hesitation in answering basic questions including his residence, all added to reasonable suspicion. *See Terry*, 392 U.S. at 22 (explaining that each act may be "perhaps innocent in itself," but taken together, the acts "warranted further investigation"); *See also District of Columbia v. Wesby*, 138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts.").

Since the pleadings are now closed, Officer Samuel Terrell, Former Chief Ronney Howard and the City of Alexandria files this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(c).

## IV.    LAW AND ANALYSIS

### A.  STANDARD FOR MOTION UNDER FRCP 12(c)

Federal Rule of Civil Procedure article 12(c) provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Robinson v. Midland Cty.*, 80 F.4th 704, 709 (5th Cir. 2023). (Citations omitted).  As stated by the United States Fifth Circuit Court of Appeal has held in *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019):

> "To survive a motion for a judgment on the pleadings, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This involves a two-step inquiry. *See Robertson*, 751 F.3d at 388, 390. First, we must identify the complaint's well-pleaded factual content. See id. at 388. In doing so, we set aside 'any unsupported legal conclusions,' the truth of which 'we cannot assume.' *Id*.; *see also Iqbal*, 556 U.S. at 678-79. Second, we ask whether the remaining allegations 'are sufficient to

19

nudge the [plaintiff's] claim across the 'plausibility' threshold.' *Robertson*, 751 F.3d at 390 (quoting *Iqbal*, 556 U.S. at 678). In other words, we ask whether we can reasonably infer from the complaint's well-pleaded factual content 'more than the mere possibility of misconduct.' *Iqbal*, 556 U.S. at 679. This is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"

Here, the plaintiffs attached video links of the traffic stop to their Complaint.  ECF No. 1 at p. 7.  Moreover, the plaintiffs attached "still shots" from the videos of the officers' body and dash cam footage.  *See Terrell v. Town of Woodworth*, 2024 U.S. App. LEXIS 3803, at *12-13 (5th Cir. Feb. 19, 2024) (when plaintiff continually refers to videos in complaint and attaches still shots in complaint, the videos are properly considered on a Rule 12 motion).

Moreover, the United States Supreme Court held in *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) dismissal was proper when the complaint's facts were "utterly discredited" by video evidence.

Even more, the United States Fifth Circuit Court of Appeal has "routinely held that 'on a motion to dismiss, the court is entitled to consider any exhibits attached to the complaint, including video evidence.'"  *Beroid v. Lafleur*, 2023 U.S. App. LEXIS 9644, at *11 (5th Cir. Apr. 21, 2023*)  Cf. Tucker v. City of Shreveport*, 998 F.3d 165, 170 (determining officers were entitled to qualified immunity "because there [was] video and audio recording of the event, [and] we are not required to accept factual allegations that are blatantly contradicted by the record") (internal quotation marks and citation omitted).

## B.  **QUALIFIED IMMUNITY**

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

20

The Fifth Circuit has held this "demands a two-step analysis: whether a constitutional right was violated and whether the allegedly violated right was 'clearly established.'" *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). (Citations omitted). The Fifth Circuit has held, "With the more specific inquiry the Court requires, the question becomes whether there is either "directly controlling authority . . . establishing the illegality of such conduct" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Gonzalez v. Huerta*, 826 F.3d 854, 858 (5th Cir. 2016). (Citations omitted).

"The plaintiff has the burden of demonstrating that the defendant official is not entitled to qualified immunity." *Id.* (Citations omitted). "To defeat qualified immunity, the plaintiff must show that the official's conduct was objectively unreasonable in light of a clearly established rule of law." *Id.* (Citations omitted).

As the Fifth Circuit has held:

> "Because qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law,' *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986), we do not deny its protection unless existing precedent places the constitutional question 'beyond debate,' *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)). The court must 'ask whether the law so clearly and unambiguously prohibited [the official's] conduct that every reasonable official would understand that what he is doing violates [the law]." *Id.* (citing *al-Kidd*, 131 S. Ct. at 2083) (second alteration in original).

*Id.*

As the United States Supreme Court has stated, "We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011). (Internal citations omitted).

Indeed, the Fifth Circuit has held, "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Id.*

Importantly, **"[t]he Supreme Court has now made clear that a plaintiff asserting constitutional claims against an officer claiming [qualified immunity] must survive the motion to dismiss without any discovery**," *Carswell v. Camp*, 54 F.4th 307, 2022 WL 17335977, *3 (5th Cir. 2022).  (Emphasis added). *Carswell* also ruled out discovery on other claims before adjudication of qualified immunity, because individuals asserting qualified immunity are to be free from the burden of discovery, including participation in discovery directed to other parties. *Carswell*, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 685-86 (2009).

### C. <u>COUNT 1 OF PLAINTIFFS' CLAIMS ARE DISCREDITED BY THE VIDEO EVIDENCE and LOUISIANA LAW – THE STOP WAS JUSTIFIED AT ITS INCEPTION</u>

Plaintiff's allege in Count 1 "violation of the Fourth Amendment for unreasonable seizure in detaining Mario and Grace without reasonable suspicion of criminal activity."  ECF No. 1 at p. 30.  Plaintiffs incorrectly allege in ¶240, "Because the officers pulled Mario over without reasonable suspicion, he was issued an invalid traffic ticket."  ECF No. 1.  Furthermore, Plaintiffs alleged in ¶ 250, "More specifically, although Officers Lewis and Terrell alleged that their basis for stopping Mario was his failure to signal his turn, indisputable video evidence proves that Mario did signal his turn."  ECF No. 1.  This is a half-truth and is neither supported by the video evidence or the letter of the law as espoused in Louisiana Revised Statute 32:104.

While this case does not involve an arrest, it is important to note the United States Supreme Court regarding pronouncement regarding probable cause for an arrest in *District of Columbia v. Wesby*, 583 U.S. 48, 57, 138 S.Ct. 577, 586, 199 L.Ed.2d 453, 463 (2018):

> "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' 540 U. S., at 371, 124 S. Ct. 795, 157 L. Ed. 2d 769, it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules,' *Illinois v. Gates*, 462 U. S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' *Id.*, at 243-244, n. 13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Probable cause 'is not a high bar.' *Kaley v. United States*, 571 U. S. 320, 338, 134 S. Ct. 1090, 1103, 188 L. Ed. 2d 46, 62 (2014)."

Importantly, here, there was only a brief stop which is short of a traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 16-19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A *Terry* stop is generally deemed reasonable when the officer has probable cause to believe that a traffic violation has occurred. *Whren v. U.S.*, 517 U.S. 806, 810 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).  Here, plaintiffs admit the officers believed Louisiana Revised Statute 32:104 was violated, which is supported by the video evidence.  ECF No. 1 at ¶¶66-67.

A traffic stop is justified at its inception when an officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* **Reasonable suspicion is a low threshold; it is not probable cause**. *United States v. Walker*, 49 F.4th 903, 906-07 (5th Cir. 2022).  (Emphasis added). "Certainly, then, if officers 'have probable cause to believe that a traffic violation has occurred,' then there is also reasonable suspicion to stop the vehicle." *Id.*, quoting *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

23

First, at the outset of the dash camera video footage A which is noted as "Link 5"[73] in the plaintiff's complaint, it shows officers travelling down four (4) lane Jackson Street Extension. At approximately 0:16-0:18 one can see Mario Rosales's red mustang make a right turn onto the right lane of Jackson Street Extension from a side street.[74] This video is manually attached, arguably showing a clearer view, as Exhibit A-1.[75] Then, at approximately 0:21-0:24, one can see Mario Rosales's red mustang drift from the right lane into the left lane (at a time straddling the center lane), and Mario Rosales failed to use his turn signal when drifting from the right to the left lane. This is a violation of Louisiana Revised Statute 32:104(D) which states:

> "The signals provided for in R.S. 32:105(B) **shall be used to indicate an intention to** turn, **change lanes** or start from a parked position and shall not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or 'do pass' signal to operators of other vehicles approaching from the rear."

As noted in *State v. Williams*, 13-732 (La. App. 5 Cir. 03/26/14); 138 So. 3d 727, 728, when an officer observes a driver changing lanes without signaling, the officer is justified in stopping the driver for a traffic violation under Louisiana Revised Statute 32:104(D).

Even more, the video link provided by the plaintiffs in their Complaint shows, Mario, later as a left turning motorist, failing to give a signal of his intent to make a left turn *at least 100 feet before the intersection* as mandated by La. R.S. 32:104(B).[76] Needless, to say, it appears Mario Rosales only activated his blinker while at the intersection once realizing a police squad car was behind him.

Louisiana Revised Statute 32:104(B) clearly states:

---

[73] Link 5: dash camera footage A (https://youtu.be/ulO3yNgZYAo) at ECF No. 1 at p. 7.
[74] *Id.* A better view may be obtained by the video manually attached as PRR [Rosales pre-stop] Dash Cam (Stream 1) at 0:16-0:18.
[75] Manual Attachment, Exhibit A-1, Dash Cam Video labeled PRR_RO~1.mp4
[76] ECF. No. 1 at p. 7: Link 1 at 0:00-0:25. *See also* Manual Attachment, Exhibit A-1, Dash Cam Video labeled PRR_RO~1.mp4

"B. Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention in the manner described hereafter and **such signal shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning**."
(Emphasis added).

Indeed, this court has held, "Louisiana Revised Statute § 32:104 requires a driver to signal a turn at least 100 feet ahead of the turn, and an individual's failure to comply with this law constitutes probable cause for an initial stop." *Wainwright v. Woodward*, 2022 U.S. Dist. LEXIS 62976, at \*5-6 (W.D. La. Mar. 18, 2022). *See also State v. Turner,* 12-855 (La. App. 5 Cir. 05/16/13); 118 So. 3d 1186, 1191 ("Deputy Collins observed Defendant's vehicle turn right without using a turn signal, which is prohibited by La. R.S. 32:104(B). Thus, Deputy Collins had probable cause to pull the vehicle over for a traffic violation").

In *Wainwright v. Woodward*, the court held:

"the footage from Trooper Woodward's vehicle very clearly shows that Wainwright failed to use his turn signal 100 feet in advance of his turn, thus violating La. R.S. § 32:104. See [22-3, Manual Attachment, Exhibit B, at 00:12-00:24]. Therefore, Trooper Woodward had probable cause to believe that Wainwright committed a traffic violation, and, **thus, the traffic stop did not violate Wainwright's Fourth Amendment rights**."

2022 U.S. Dist. LEXIS 62976, at \*6 (W.D. La. Mar. 18, 2022). (Emphasis added).

Moreover, as discussed *infra,* Mario Rosales was violating Louisiana Revised Statute 47:513 when he failed to register his vehicle in the state of Louisiana after living in Louisiana for thirty (30) days.[77] Furthermore, Louisiana Revised Statute 47:501 was also violated given he had resided in Louisiana (over 90 days) since October[78] at the time of traffic stop on June 15, 2022.[79] *See* ECF No. 1 at p. 28 at fn. 3.

---

[77] While not cited for a violation of Louisiana Revised Statute 32:404, arguably Rosales was in violation of it as well.

[78] ECF No. 1 at p. 7 footer: Link 3 Officer Lewis's body camera at 5:00-5:12. *See also* Manual Attachment, Exhibit A-2.

[79] As noted in *Riley v. Wava H. Budden*, 2005-1752 (La. App. 1 Cir. 02/14/07); 949 So.2d 677 at footnote 2:

25

Notably, Louisiana Code of Criminal Procedure article 215.1(D) provides in pertinent part, "nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950."

This has been highlighted by the Louisiana Supreme Court[80] in *State v. Lopez*, 00-0562 (La. 10/30/00); 772 So.2d 90, 92-93:

> "Without regard to the trooper's subjective intent, respondent's speeding above the posted limit gave the officer an objective probable cause basis to pull over the vehicle for a traffic violation. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  La.C.Cr.P. art. 215.1(D) … provides, however, that 'nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with the administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950.' La.C.Cr.P. art. 215.1(D) therefore did not preclude the trooper from conducting a routine driver's license and vehicle registration check with respondent, *a non-resident motorist*, or from engaging in conversation with him and his passenger, while he did so. See La. R.S. 32:404(A); La.R.S. 47:511(A).
> **Respondent's agitated demeanor and conflicting accounts of their itinerary given by the vehicle's occupants then gave the trooper reasonable suspicion to enlarge the scope of his investigation**."

(Emphasis added).

Given the above and foregoing, the traffic stop was valid at its inception.

---

"We note that Louisiana's motor vehicle and traffic regulation laws require that every person, before operating a motor vehicle on any public street, road, or highway of this state, obtain a driver's license from the Louisiana Department of Public Safety. LSA-R.S. 32:52 and 32:402. Although Title 32 enumerates exceptions to this requirement, only a "nonresident" is entitled to drive under the license of a foreign state, and then only for a period of ninety days. LSA-R.S. 32:404. Further, all vehicles operated on the highways of Louisiana are required to be registered in this state pursuant to LSA-R.S. 32:51 and 47:501, unless the vehicle is owned by a "resident of another state" and falls within the exception provided by LSA-R.S. 47:511. And, every vehicle required to be registered in this state is also required by LSA-R.S. 32:1301 and 1304 to be inspected by a state-approved inspector and bear an inspection sticker. Civil and criminal penalties have been promulgated for violations of Title 32 and Title 47 laws. See LSA-R.S. 32:57, 32:427, 32:1310, and 47:516."

[80] *Cf. "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." Michigan v. DeFillippo, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343, 348-49 (1979).*

**D. COUNTS 2, 3 and 5 OF PLAINTIFFS' CLAIMS ARE DISCREDITED BY THE VIDEO EVIDENCE AND LOUISIANA LAW AGAINST OFFICER TERRELL**

Count II of Plaintiffs' claims seem to invoke whether the stop was unreasonably prolonged. The plaintiffs' claim that the stop took more than "21 minutes," but fails to take into account the time needed for the officers' to secure their safety, the vague and ambiguous statements the plaintiffs made, their repeated demands to retrieve a cell phone in the Mustang when there was a firearm and highly lethal ammunition in the Mustang, their inconsistent statements and their implausible stories which undoubtedly contributed to the length of the stop and reasonable suspicion. Even more, at approximately eleven minutes, questioning by officers had finished and only computer checks and the writing of the traffic citation was being done. Therefore, the plaintiffs should hardly complain about this.

Significantly, the United States Supreme Court has held, "our cases impose no rigid time limitation on Terry stops." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). Indeed, the Fifth Circuit has held, "[t]here is . . . no constitutional stopwatch on traffic stops." *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc). *See State v. Turner*, 2013-0180 (La. 03/01/13), 108 So. 3d 753 (one hour detention of handcuffed suspect while awaiting a K-9 unit did not convert investigatory stop into de facto arrest unsupported by probable cause); *Windham v. Harris Cnty., Texas*, 875 F.3d 229 (5th Cir. 2017) (holding that a 90-minute traffic stop was not converted to an arrest where the Officer reasonably had to wait on a certified drug recognition expert to arrive to determine the individual's impairment); *United States v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (50 minutes within parameters of *Terry* stop); *United States v. Davies*, 768 F.2d 893 (7th Cir. 1985)(45-

27

minute stop constitutionally permissible); <u>U.S. v. Richards</u>, 500 F.2d 1025 (9th Cir. 1974) (stop in excess of one hour not unreasonable).

Reasonable suspicion is a low threshold, requiring that an official have "'some minimal level of objective justification' for making the stop." <u>United States v. Sokolow</u>, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting <u>INS v. Delgado,</u> 466 U.S. 210, 217, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)).

Strangely, as soon as Mario Rosales stepped out of his red Mustang after being pulled over by law enforcement for violating Louisiana Revised Statute 32:104, Rosales's very first statement to Officer Terrell is: "**All right now I'm getting agitated**."[81]

Even more, Mario Rosales never notified officers he had a firearm in the car, until asked by Officer Lewis.[82]  Arguably, a law-abiding citizen would have notified law enforcement officers immediately of the presence of a firearm/handgun in the vehicle.[83]  Count 3 of Plaintiffs' Complaint alleges "unreasonable searches."  ECF No. 1 at ¶¶261-266.

As shown in the video footage during this traffic stop on the road, Plaintiff, Mario Rosales, admitted he had a handgun/firearm, a "Taurus," in the car - *only after* he was asked by Officer Lewis if he had a gun in the car.[84]  Plaintiff, Mario Rosales, did not volunteer this information to law enforcement officers in a high-stakes traffic stop.[85]

---

[81] *See* Manual Attachment A-3, Officer Terrell Body Camera at 0:01-0:04.

[82] ECF 1 at p. 7 - Link 3: Officer Lewis's body camera (https://youtu.be/0XjELiN3TZc) at 1:02- 1:17.  *See also* Manual Attachment A-2.

[83] *See* La. R.S. 40:1379.3(I)(2).

[84] ECF No. 1 at p. 7.  Link 1 at 2:20-2:30.  *See also* Link 3: Officer Lewis's body camera footage at 1:02-1:16.

[85] According to Louisiana law, specifically, R.S. 40:1379.3(T)(2), those traveling in Louisiana from other states must have a permit or license from their home state. If they are older than 21 years of age, and have a valid out-of-state permit from a state recognized via reciprocity by the state of Louisiana, their permit shall be considered a valid permit within state lines.  This reciprocity agreement between states allows those with valid Louisiana permits to legally carry in participating states, while allowing citizens of those states to legally carry in Louisiana.  New Mexico, where Mario says he was from, notably lacks reciprocity with Louisiana.

Indeed, Officer Lewis had spotted in plain view[86] highly lethal "critical defense ammo"[87] in the glove box of the red Mustang of Mario Rosales, where the passenger Gracie Lasyone had been sitting.[88]  Notably, one court has suggested possession of "critical defense" ammunition can suggest a "more sinister motive" than just for use to kill small animals.  _United States v. Shaffer_, 781 F. App'x 404, 415 (6th Cir. 2019).

Curiously, before this point, Gracie Lasyone, Mario's girlfriend, was asked by Officer Lewis if there was a weapon in the car and she gestured "no" with her head when the highly lethal ammunition was visible to Officer Lewis at that time located right in front of her in the glove box, and she was the girlfriend of Mario Rosales and lived with him.[89]  Critically, the Fifth Circuit has held when a passenger misrepresented that there was not a weapon in the car, when there was – this can create reasonable suspicion.  _United States v. Alvarez_, 837 F. App'x 296, 299 (5th Cir. 2020).  Indeed, most law-abiding citizens would volunteer this information to a law enforcement officer at the outset of a traffic stop.  Yet, neither plaintiff did so.

Despite this, the plaintiffs allege in ¶257 of their complaint, "The officers unreasonably prolonged the stop to frisk Mario for weapons when the officers lacked reasonable suspicion that he was both armed and dangerous."   However, "a protective sweep for weapons during a traffic stop is justified where the officers reasonably believe that someone within police custody might gain access to weapons, either during the traffic stop or once they are returned to their vehicles."

---

[86] _Cf. United States v. Wallen_, 388 F.3d 161, 167 (5th Cir. 2004) ("reasonably prudent person would be warranted in detecting danger from these circumstances, particularly in light of the guns that were already identified in plain view").

[87] Generally, critical defense ammunition is made to expand in body cavities.  It is considered more lethal than full metal jacket ammunition.

[88] ECF No. 1 at p. 7.  Link 3 Officer Lewis's body camera at 18:00-18:08.  _See also_ Manual Attachment, Exhibit A-2.

[89] ECF No. 1 at p. 7.  Link 3 at 0:52-0:57.  _See also_ Manual Attachment A-2.

29

*Davila v. United State*s, 713 F.3d 248, 259 (5th Cir. 2013).  Even more, "questions directed toward officer safety, such as inquiring about dangerous weapons, do not unconstitutionally extend the stop" as plaintiffs have incorrectly alleged here. *United States v. Coker*, 2014 U.S. Dist. LEXIS 83743, at *41-42 (E.D. Tenn. Jan. 6, 2014).

The United States Supreme Court has held, "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect."  *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481(1983).  Indeed, in *Michigan v. Long*, the High Court was concerned a "suspect [in a *Terry* stop] may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons."  *Id.* at 1052.  In fact, in *Michigan v. Long*, the United States Supreme Court held:

> "In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation 'at close range,' *Terry*, 392 U.S., at 24, when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ." *Id.*, at 28. In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter."

*Id.* at 1052.

In reliance on *Long*, the Fifth Circuit has held in *United States v. Brown*, 209 F. App'x 450, 452 (5th Cir. 2006):

> "For purposes of a *Terry* pat-down, 'the officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' *Id.* Where an initial stop and pat-down of an occupant of a car are justified under *Terry*, a search of the car for weapons is also a valid "Terry pat-down" of the car. See *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004) (upholding protective sweep of car as *Terry* pat-down under the rationale set forth in *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983))."

30

When conducting a stop and frisk, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). *See Terry*, 392 U.S. at 24, 88 S. Ct. at 1883 ("An officer need not be certain that an individual is armed….").

Here, Officer Lewis asked Mario, "Hey, can I have your permission to retrieve that firearm out of your gun, or out of your uh vehicle?"[90]

Mario Rosales answered, "**No, I don't want anybody searching my vehicle**."[91]

"Okay, cool. Yeah, I get it," said Officer Lewis.[92]

(Emphasis added).

Notably, Louisiana Revised Statute 40:1379.3(I)(2) provides:

"A permittee armed with a handgun in accordance with this Section or a person carrying a weapon pursuant to R.S. 14:95(M) **shall notify any police officer who approaches the permittee in an official manner or with an identified official purpose that he has a weapon on his person, submit to a pat down, and allow the officer to temporarily disarm him. Whenever a law enforcement officer is made aware that an individual is carrying a concealed handgun and the law enforcement officer has reasonable grounds to believe that the individual is under the influence of either alcohol or a controlled dangerous substance, the law enforcement officer may take temporary possession of the handgun and request submission of the individual to a department-certified chemical test for determination of the chemical status of the individual.** Whenever a law enforcement officer is made aware that an individual is behaving in a criminally negligent manner as defined under the provisions of this Section, or is negligent in the carrying of a concealed handgun as provided for in R.S. 40:1382, the law enforcement officer may seize the handgun, until adjudication by a judge, if the individual is issued a summons or arrested under the provisions of R.S. 40:1382. Failure by the permittee to comply with the provisions of this Paragraph shall result in a six-month automatic suspension of the permit."
(Emphasis added).

---

[90]  ECF No. 1 at ¶59.  ECF No. 1 at p. 7.  Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

[91] ECF No. 1 at ¶60.   Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

[92] ECF No. 1 at ¶61.  Link 3 Officer Lewis's body camera at 1:24-1:30.  *See also* Manual Attachment, Exhibit A-2.

Officer Lewis, thus, did not retrieve the plaintiff's firearm from his vehicle because the plaintiff stated he could not do so.  Nevertheless, the plaintiffs complain that the Officers did not allow Gracie, to retrieve her phone, out of the car, *when the car had a firearm in it and highly lethal ammunition*.[93]  This defies logic. This is hardly something the plaintiffs should be complaining about in their Complaint.  Officers are entitled to protect themselves and the public.

As stated by the Fifth Circuit regarding a protective search: "the fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer." *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004).  *See Malbrough v. Stelly*, 814 F. App'x 798, 806 (5th Cir. 2020) ("We cannot allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day") (internal quotation marks omitted).

Plaintiffs also take issue Officer Lewis requesting that Mario Rosales empty his pockets,[94] but Fifth Circuit precedent squarely has allowed this for years.  *See United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003) (holding that in light of the officer's reasonable  [*68] suspicion that the defendant might be armed, the officer's request that the defendant empty his pockets and their shirts was permissible under Terry);  *See also United States v. Wise*, 877 F.3d 209, 223 (5th Cir. 2017)

Officer Lewis asks Mario Rosales since he was driving a vehicle with a New Mexico license plate, "How long have you been in the state of Louisiana?"  Mario Rosales responded, "**It's off and on**."[95]  He continued, "I've been trying to get residence here; I work at Atlas Home Service

---

[93] ECF No. 1 at ¶¶97, 93.
[94] ECF No. 1 at ¶¶81, 1.
[95]  ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 2:50-2:54. *See also* Manual Attachment, Exhibit A-2.

and I've been trying to buy a home."[96]  When Officer Lewis asked him how long Rosales had been in the state of Louisiana, Rosales hesitated while putting his hand on his head as if to think, and then said, "Now… whenever I first come here it would have been October."[97]  Then, Rosales said in an unsure voice, "I've been here [pause]….  **I go back [to New Mexico] every once in a while**."[98]  (Emphasis added).

He then proceeded to tell Officer Lewis, he lives at Gracie's sister's house in Dry Prong. Rosales also seemed unsure of when the last time he was in New Mexico stating, "It was a couple of weeks ago [pause]… not even a couple of weeks ago, maybe April - Easter."[99]  Officer Lewis then asks him, "you were there for how long – for Easter?"[100]  Then, curiously, Rosales shook his head as if he did not know or could not remember, then responded he was there for an extra holiday.[101]

Indeed, its clear Officer Lewis was pursuing a line of questioning regarding Louisiana Revised Statute 47:513 when he told Mario Rosales when you move from out of state to in state you have thirty (30) days to register.  *See also* La. R.S. 47:501.

Louisiana Revised Statute 47: 513 provides:

"Every nonresident person, regularly employed in or carrying on a business within this state for a period of at least thirty consecutive days and owning or leasing and regularly operating, in such business or in connection therewith, any motor vehicle, trailer or semitrailer within this state, shall be required to register each vehicle and pay the same license taxes therefor as is required with reference to like vehicles owned by residents of this state. This Section shall

---

[96] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 2:54-3:10.  *See also* Manual Attachment, Exhibit A-2.

[97] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 5:00-5:12.  *See also* Manual Attachment, Exhibit A-2.

[98] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 5:12-5:22.  *See also* Manual Attachment, Exhibit A-2.

[99] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 6:20-6:29.  *See also* Manual Attachment, Exhibit A-2.

[100] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 6:37-6:40.  *See also* Manual Attachment, Exhibit A-2.

[101] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 6:40-6:44.  *See also* Manual Attachment, Exhibit A-2.

not apply to vehicles which are covered by reciprocal agreements in effect between Louisiana and other jurisdictions."

Indeed, plaintiff's demeanor at the scene as "kind of out of it," "rambling on," "some of what [the plaintiff] was saying didn't make a whole lot of sense," and the plaintiff "wasn't answering the questions clearly" added to reasonable suspicion to extend a traffic stop. *Webb v. Arbuckle*, 2011 U.S. Dist. LEXIS 28259, at *18 (W.D. La. Mar. 18, 2011). There, the court granted officers qualified immunity on a one-hour traffic stop.

Indeed, the United States Supreme Court has held, "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 576 (2000). *See also District of Columbia v. Wesby*, 583 U.S. 48, 59-60, 138 S.Ct. 577, 587, 199 L.Ed.2d 453, 465 (2018) ("Based on the vagueness and implausibility of the partygoers' stories, the officers could have reasonably inferred that they were lying and that their lies suggested a guilty mind").

Oddly, when Officer Lewis asked where Rosales was going to then, Rosales pointed to where he had already driven and said, "Right now, I was headed to the bank."[102]  Then, Mario Rosales contradicts himself and says, "Actually, I already hit the bank [pause]" and then, said he was heading to Bunkie.[103]

Then, Lasyone answered Officer Lewis that they did not stop anywhere between Atlas Home Services, their work, and the traffic stop. Yet, when Officer Lewis said quizzically, "you did not stop anywhere else?" Lasyone then contradicted herself, only after prompting from Officer

---

[102] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 7:00-7:10. *See also* Manual Attachment, Exhibit A-2.
[103] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 7:10-7:35. *See also* Manual Attachment, Exhibit A-2.

Lewis, and she said actually we stopped at the bank.[104]  Notably, an untruthful answer can "create[] further suspicion justifying continued detention." United States v. Andres, 703 F.3d 828, 834 (5th Cir. 2013) ("Andres' untruthful answer created further suspicion justifying continued detention, and his subsequent answers created even further suspicion").

Then, plaintiffs started questioning Officer Lewis as to why Lasyone, the occupant, had to be out of the vehicle, and Lewis says she had to be out of the vehicle because there is a firearm in that vehicle.[105]  All the while, Officer Terrell was writing the traffic ticket.  At that time, Officer Terrell started running the driver's license, and computer checks through dispatch.  This was approximately eleven minutes into the traffic stop.

Even more, the plaintiff complains about the officers asking a series of questions about drugs.[106]  Yet, it should be noted the Fifth Circuit has completely *rejected* the notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation.  United States v. Brigham, 382 F.3d 500, 508 (5th Cir. 2004).  Also, a unanimous United States Supreme Court held in Whren v. United States, 517 U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) noted "a traffic-violation arrest . . . would not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search.'"  Here, the officers questioning showed a graduated response to emerging facts.

Moreover, the Western District of Louisiana has held a plaintiff's "contention that the traffic stop was unconstitutional because the officers' ultimate purpose was to interdict illegal drugs fails, as the subjective motivation for the stop is irrelevant when there was an objective legal

---

[104] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 8:30-8:50.  *See also* Manual Attachment, Exhibit A-2.
[105] ECF No. 1 at p. 7 footer:  Link 3 Officer Lewis's body camera at 10:38-11:10.  *See also* Manual Attachment, Exhibit A-2.
[106] ECF No. 1 at ¶109, *et seq.*

35

justification for the stop" such as a violation of Louisiana Revised Statute 32:104.  *Webb v. Arbuckle*, 2011 U.S. Dist. LEXIS 28259, at *13-15 (W.D. La. Mar. 18, 2011).  *See also Whren*, 517 U.S. at 812-13, 116 S.Ct. at 1773-1774.  *State v. Davis,* 09-452 (La. App. 5 Cir. 01/26/10); 31 So. 3d 513, 517 ("Police officers may make an initial traffic stop after observing a traffic infraction, even if the stop is a pretext to investigate for controlled dangerous substances").

Still, given Louisiana Revised Statute 40:1379.3(I)(2), it seems quite appropriate for an officer to ask questions about controlled dangerous substances when someone has a handgun or is driving a vehicle (and repeatedly leans on the hood of the patrol car during the traffic stop). Even more, asking about prior arrests or convictions are pertinent since it could indicate a felon in possession of firearm.

Furthermore, while plaintiffs stated Mario Rosales worked in Alexandria at Atlas Home Services, it seemed odd that his passenger admitted he returned to New Mexico often sometimes staying weeks and even up to a month at a time.  This seemed implausible given steady employment in Alexandria, and could be indicative of drug courier status with travel along border states.

Plaintiffs likewise complain about Officer Terrell interrogating Gracie Lasyone.  Yet, the Fifth Circuit made clear, "An officer may also seek to identify and run computer checks on passengers and ask questions about the purpose and itinerary of the trip, or ask questions on subjects completely unrelated to the circumstances that caused the stop if such questions do not extend the stop's duration."  *United States v. Alvarez*, 837 F. App'x 296, 299 (5th Cir. 2020).

Indeed, when Officer Terrell asked Gracie, "Is there anything illegal in the vehicle?"[107]

Gracie responded, "*Not to my knowledge*"[108] to which Officer Terrell stated, "**There was some**

**hesitancy there**."[109]  Officer Samuel Terrell's body cam is manually attached as Exhibit A-3.[110]

Then, Officer Terrell asked, "If there was, what do you think it would be?"  Gracie

responded, "I don't *think* there's anything in there."[111]

When Officer Terrell asked where Gracie lived, she stated "here"[112] having been pulled over

in Alexandria, Rapides Parish, Louisiana.  Yet, when further questioned, she stated she lived with

"her sister" but upon further prompting answered "I live *out* in Dry Prong" which is in Grant

Parish, Louisiana.[113]  She continued, Mario Rosales is from Roswell (New Mexico), and he

"**comes back and forth**."[114]

Indeed, evasive answers about residence related to a driver can add to reasonable suspicion.

<u>Cunningham v. Panola Cty</u>., 2011 U.S. Dist. LEXIS 57850, at *21-24 (E.D. Tex. May 8, 2011).

After Officer Terrell asked if Gracie had been arrested, she inquired, "Is there a reason for

these questions?" She also, asked "Why?" to Officer Terrell twice as he an Officer Terrell and

Lewis asked questions.[115]  This pattern of asking questions in response to Officer Terrell's asking

questions was unusual to say the least.

---

[107] ECF No. 1 at p. 7 footer:  Link 4:  Officer Terrell's body camera at 3:53-3:56.  *See also* Manual attachment Ex. A-3.
[108] ECF No. 1 at p. 7 footer:  Link 4:  Officer Terrell's body camera at 3:55-3:58.  *See also* Manual attachment Ex. A-3.
[109] ECF No. 1 at ¶¶146-148.  ECF No. 1 at p. 7 footer:  Link 4:  Officer Terrell's body camera at 3:58-4:01.  *See also* Manual attachment Ex. A-3.
[110] *See* Manual Attachment A-3, Officer Terrell's Body Camera labelled as PRR[Rosales] Body Cam (Stream 1) Samuel Terrell:  PRR_RO~4.mp4
[111] ECF No. 1 at ¶¶150-151. ECF No. 1 at p. 7 footer:  Link 4: Officer Terrell's body camera at 4:01-4:08.
[112] ECF No. 1 at p. 7 footer:  Link 4:  Officer Terrell's body camera at 4:11-4:12.  *See also* Ex. A-3.
[113] *Id.* at 4:21-4:57.
[114] *Id.*
[115] *Id.*  at 5:13-5:30.

Then, Gracie made the statement, "You just pull people over 'cause you are curious?"[116] Terrell responded that Rosales was pulled over because "he failed to signal."[117] She again requests to retrieve her phone in the vehicle, when Rosales's handgun and highly lethal ammunition was located in the vehicle. Notably, the Fifth Circuit has held a pattern of answering an officer's questions with questions of their own may contribute to an officer's increasing suspicion. _United States v. Brigham_, 382 F.3d 500, 508 (5th Cir. 2004)

She then states, "We have had bad experiences" with the police in the past.[118] To which Officer Terrell questions Gracie, "You've had bad experiences with the police before?" and she answers, "he has" pointing at Rosales.[119] Officer Terrell then follows up with the question "For what?" Lasyone did not elaborate further.

When Officer Terrell asked Mario Rosales whether he was going "back and forth" to New Mexico, Rosales was evasive stating, "Uhm, I'm trying to make this place my new place of residency."[120]

In _Penney v. Wolsey_, Plaintiff stated that he had lived in Washington for four years "off and on," but he was not normally there because he was usually in Canada or California. 2008 U.S. Dist. LEXIS 121720, at *4 (S.D. Tex. June 3, 2008). The court held, _inter alia,_ that Plaintiff's inconsistent or evasive answers to straightforward questions about his residence, travel plans and intended destination provided reasonable suspicion and continued questioning. _Id._ at *37.

After all, when asked how often Rosales made the trip from New Mexico to Louisiana, Lasyone hesitated and stated, "Every few months _maybe._"[121] She also stated he would stay in

---

[116] ECF No. 1 at p. 7 footer: Link 4:Officer Terrell's body camera at 5:13-5:30. _See also_ Manual attachment A-3.
[117] _Id._ at 5:30-5:34.
[118] _Id._ at 6:25-6:28.
[119] _Id._ at 6:28-6:37.
[120] _Id._ at 8:29-8:33.
[121] _See_ Manual Attachment A-3, Officer Terrell Body Camera at 4:30-4:37.

New Mexico a few weeks, up to a month when he went to New Mexico, despite having a job in Alexandria at Atlas Homes Services.  Indeed, these discrepancies and their answers were strange, and were somewhat suggestive of drug courier activity with frequent travel along border states.

Here, "[c]loaked with qualified immunity," Officer Terrell is afforded wide "latitude in assessing the legal temporal limit of a *Terry* stop."  *Myers v. James*, 2004 U.S. Dist. LEXIS 24385, at *18 (E.D. La. Nov. 26, 2004) ("Given the fact that officers received some resistance to their request for identification, it is not unreasonable that twenty, or even forty minutes, might have elapsed during the background check and the waiting period for their supervisor's (Sargeant Scanlan) arrival").  Thus, Officer Terrell is entitled to qualified immunity.

### E.  COUNTS 4 and 6 ARE WITHOUT MERIT AS THERE WAS NO FIRST AMENDMENT VIOLATION BY OFFICER TERRELL

Here, the plaintiff cites to *Turner v. Lieutenant Driver*, 814 F. 3d 678 (5th Cir. 2017) that Officer Terrell violated the plaintiffs First Amendment right to record the police.  First, *Turner* is distinguishable from this case, since it involved recording police from a public sidewalk.  In that case, the Fifth Circuit held, "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." *Turner*, 848 F. 3d 678, 688. Notably, the Fifth Circuit did not define what time, place, and manner restrictions on this right would be reasonable in Turner's case. *Id.* at 690.

Significant in this case, plaintiff has cited no precedent that allows a right to record on the part of a person who is being lawfully detained—for reasons unrelated to any First Amendment activity.  Moreover, the First Amendment right to record police is certainly not unqualified given that it is subject to time, place, and manner restrictions.

Since the right to videotape police "is subject to reasonable time, place, and manner restrictions," arguably, these restrictions were "justified without reference to the content of the

regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information" in the event of a highly dangerous traffic stop and detention.  *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)).   Indeed, here, the restriction of plaintiffs' ability to record while being temporarily detained were reasonably related to legitimate law enforcement needs.

As stated in *Durant v. Gretna City*, 2020 U.S. Dist. LEXIS 8422, at *66-67 (E.D. La. Jan. 17, 2020), *aff'd sub nom*. *Durant v. Brooks*, 826 F. App'x 331 (5th Cir. 2020) (same).:

> "Clearly, despite the general right to record police activity, no binding or robust persuasive authority put Officer Brooks on notice that a detained person in handcuffs has the right to record police activity. As a result, 'every reasonable official' would not have understood that prohibiting a handcuffed detainee from using his cell phone to record police activity violates the law. Officer Brooks is entitled to qualified immunity and summary judgment on Durant's First Amendment retaliation claim."

Similarly, in *Dave v. Laird*, 2021 U.S. Dist. LEXIS 254682, at *34 (S.D. Tex. Nov. 30, 2021), adopted by 2022 U.S. Dist. LEXIS 40981, 2022 WL 889989 (Mar. 25, 2022) the court held:

> "Although the general right to film the police is clearly established in this circuit, *Dave has cited no Fifth Circuit precedent or persuasive authority indicating that he had the right to personally film his own detention, with his own hand-held camera phone, while it was happening.* This Court has also searched and found no authority to that effect. This is, perhaps, not altogether surprising. Courts within this jurisdiction and elsewhere have pointed out that establishing such a right could create unreasonable or even potentially dangerous obstacles for law enforcement. For example, in *Brunson v. McCorkle*, the court noted that the plaintiff's "desire to keep his hands operating his recording device" was "incompatible" with law enforcements execution of their duties because "the video recording device was in the very hands that law enforcement sought to handcuff." No. 11CV1018 JCH/LAM, 2012 WL 13076260, at *5 (D.N.M. Sept. 18, 2012) (noting, additionally, that the plaintiff had cited no case from "any jurisdiction" which clearly established "that an arrestee has a right to video record his own detention."). *See also Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 963 (10th Cir. 2018) ("Sandberg does not point to a case in which the videographer was also the subject of the police [*35] action. As such, it was not clearly established that officers violate the First Amendment when they prevent a person who is the subject of the police action from

40

filming the police."); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 381 (S.D.N.Y. 2015) ("[T]he right to record police activity . . . may not apply . . . if the recording interferes with the police activity, if it is surreptitious, if it is done by the subject of the police activity[.]").

The law simply did not give defendant, Officer Terrell, "fair warning" that his conduct was unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (although officials can be on notice that their conduct violates established law even in novel factual circumstances, the law must give the defendant officer "fair warning" that his or her conduct was unconstitutional).

Beyond that, almost 30 years ago, the United States Supreme Court held that a passenger can be ordered out of a vehicle just as a driver during a traffic stop in *Maryland v. Wilson* and prohibited from going back to the car:

> **"Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.**"

519 U.S. 408, 413-14, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, 47-48 (1997).  (Emphasis added).

Similarly, in *Michigan v. Long*, the United States Supreme Court was concerned a "suspect [in a Terry stop] may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons."  463 U.S. 1032, 1052.  Thus, Officer Terrell's conduct was completely reasonable in not allowing Lasyone to return to the Mustang to obtain her cellphone when a firearm was inside the Mustang.  Therefore, qualified immunity applies.

Even more, the plaintiffs fail to adequately allege a First Amendment retaliation claim under *Iqbal* or *Twombly*.

41

## F. COUNTS 5 AND 6 AGAINST FORMER CHIEF RONNEY HOWARD AND THE CITY OF ALEXANDRIA ARE WITHOUT MERIT

Section 1983 does not create vicarious liability or respondeat superior liability for the wrongdoing of others. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-94 (1978) (holding that supervisory officials cannot be held vicariously liable for their subordinates' actions under section 1983); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("'[S]upervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.") (Citation omitted).  Therefore, former police chief Ronney Howard cannot be held vicariously liable for any acts of Officer Terrell nor can the City of Alexandria.

Moreover, the defendant municipality actor's liability for a constitutional violation is a prerequisite to finding liability against the defendant municipality. *See Malbrough v. Stelly*, 814 F. App'x 798, 806 n.15 (5th Cir. 2020) ("A municipality cannot be held liable when its employee did not violate the Constitution.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)); *accord Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) ("As is well established, every Monell claim requires an underlying constitutional violation.") (cleaned up).  Here, since there are no underlying constitutional violations, there is no *Monell* liability.

Moreover, the plaintiffs rely on unconstitutional policies that are "widespread."  ECF No. 1 at ¶¶273, 280 in Count 5 and 6.  As stated by the Fifth Circuit:

> "Plaintiffs must therefore demonstrate that there existed '[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'  Plaintiffs must also establish '[a]ctual or constructive knowledge of such custom" by the municipality or the official who had policymaking authority. In this circuit:

42

Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity."

*Hicks-Fields v. Harris County*, 860 F.3d 803, 808-09 (5th Cir. 2017).

Here, plaintiffs only evidence are the events of this traffic stop involving the plaintiffs in the case *sub judice.*  This is not enough.  "[P]lausibly to plead a practice 'so persistent and widespread as to practically have the force of law,' [the plaintiffs] must do more than describe the incident that gave rise to his injury."  *Ratliff v. Aransas Cty.*, 948 F.3d 281, 285 (5th Cir. 2020). The Fifth Circuit held, when the plaintiff only pleads facts related to the plaintiffs' injury, this fails to satisfy *Twombly* and *Iqbal* standards to show a widespread practice.  *Id.  See also Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018).

Indeed, the Western District of Louisiana recently held:

"To plead a *Monell* claim on the basis of a wide-spread practice, the plaintiff must plead facts showing "sufficiently numerous prior incidents," as opposed to 'isolated instances.' *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989). Specifically, a plaintiff 'must do more than describe the incident that gave rise to his injury.' *Ratliff v. Aransas Cty., Texas*, 948 F.3d 281,285 (5th Cir. 2020). The facts pled must also show incidents similar to the conduct at issue in the instant case—that is, '[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.' *Peterson v. City of Fort Worth, Tex*., 588 F.3d 838, 851 (5th Cir. 2009) (quoting *Estate of Davis ex rei McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). A plaintiff is required to plead more than a list of past actions alleged to be unconstitutional; a plaintiff must place these past occurrences in context to support the inference that the municipality knew about and accepted a wide-spread course of unconstitutional conduct. *Peterson*, 588 F.3d at 851 n.4."

*Mejia v. Lafayette Consol. Gov't*, 2024 U.S. Dist. LEXIS 199262, at *9 (W.D. La. Sep. 26, 2024).

Here, the plaintiffs have failed to allege any prior incidents in its complaint sufficient to show a widespread practice.  Indeed, plaintiffs' allegations are mere conclusions devoid of any facts.

43

Moreover, the plaintiffs have cited deficiencies in training. ECF No. 1 at ¶¶275(a), 280. Specifically, plaintiffs conclusory plead "officers are trained and encouraged to pull over motorists without reasonable suspicion of criminal activity, by concocting a baseless traffic infraction to support their actions" without a scintilla of factual support for this bold conclusory statement. ECF No. 1 at ¶275(a). The plaintiffs also allege in a conclusory fashion "that officers are trained and encouraged to prohibit detained individuals from recording police activity during a traffic stop regardless of whether the traffic stop was wrongfully initiated, expanded in scope, prolonged, and regardless of whether the recording could be performed in a non-disruptive manner." ECF No. 1 at ¶280.

The Fifth Circuit has held, "To establish a failure-to-train claim, a plaintiff must 'prove that (1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights.'" _Hutcheson v. Dall. Cty._, 994 F.3d 477, 482 (5th Cir. 2021).

The Fifth Circuit went on to explain, "To show deliberate indifference, a plaintiff normally must allege a 'pattern of similar constitutional violations by untrained employees.'" _Id._ at 482-483. Here, plaintiffs have failed to show a pattern of similar constitutional violations. Moreover, this does not fit the "single incident exception" because it is "extremely narrow." _Id._ The single-incident exception "is generally reserved for those cases in which the government actor was provided no training whatsoever." _Id._ Here, the plaintiffs have not alleged that there was no training whatsoever.

Moreover, Count 6 does not even allege "deliberate indifference." Additionally, the plaintiffs fail to identify a policymaker in their _Monell_ claim. (Doc. 1 at ¶¶271-282). Case law in

44

this circuit makes clear a plaintiff must identify a policymaker in a § 1983 action against a municipality. *See* <u>Piotrowski v. City of Houston</u>, 237 F.3d at 579 (5th Cir. 2001) (noting that identifying a municipal policymaker who could be held responsible under § 1983 "is not an opaque requirement . . . ."). Therefore, Counts 5 and 6 should be dismissed.

## G.  PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES

"[P]unitive damages are available from individual defendants under Section 1983." <u>Collier v. Roberts</u>, 2015 U.S. Dist. LEXIS 30643, at *13 (M.D. La. Mar. 10, 2015). Therefore, punitive damages are not allowable against the City of Alexandria or former Chief Ronney Howard in their official capacities.

Moreover, while punitive damages are authorized against those sued in their individual capacities, it is limited. "Under Section 1983, punitive damages may be awarded only if the official conduct is 'motivated by evil motive or intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights." *Id.* Here, plaintiffs have failed to allege sufficient facts that Officer Terrell was motivated by evil motive or intent or reckless or callous indifference to the plaintiffs' constitutional rights.

## V.     CONCLUSION

Simply put, the traffic stop was valid at its inception. Rosales's agitated state from the outset of the traffic stop was unusual. Moreover, the fact that the Mustang had highly lethal ammunition in plain view in the glove compartment, along with a firearm in a bag in the backseat, by Rosales's own admission after being questioned, added to concerns for officer safety and that of the public. Additionally, Rosales's outright refusal to allow the officers to secure the firearm during the traffic stop heightened the level of danger facing the peace officers and did not reassure the peace officers of their safety.

45

Even more, the plaintiffs' non-definitive, evasive, inconsistent, indirect and implausible answers to questions by the officers raised suspicions.  Beyond that, Lasyone's pattern of answering questions with questions was unusual to say the least.

Furthermore, the plaintiffs' repeated, unreasonable requests to retrieve a cellphone out of the Mustang so Lasyone could record the stop when the Mustang had a firearm in it posed an egregious safety risks for the peace officers (including Officer Terrell), especially given the plaintiffs references to prior "bad experiences" with law enforcement.  Do the plaintiffs expect for law enforcement to put their lives in danger?  What are the damages when the complete stop was recorded by the officers' body worn camera and dash camera video footage, as the officers had repeatedly reassured the plaintiffs throughout the entirety of the encounter?

Here, as to the duration of the stop, the plaintiffs have no one to blame but themselves. Simply put, both the Fifth Circuit and the United States Supreme Court has held there is no rigid time limitation on a _Terry_ stop.  The United States Supreme Court has repeatedly held that the courts should not indulge in unrealistic second-guessing of officers in these instances.

Indeed, there was no violation of the Constitution in this case.  Officer Terrell clearly had probable cause to believe a traffic violation had occurred.  Regardless, Officer Terrell is entitled to qualified immunity.  After all, there is no case law that placed the statutory or constitutional questions in this case beyond debate to put Officer Terrell on notice of a constitutional violation.

Based on the above and foregoing, Officer Terrell, the City of Alexandria and former Chief Ronney Howard are entitled to be dismissed from this lawsuit with prejudice.

Respectfully submitted,


BY: *s/ Misty Shannon Antoon*
Misty Shannon Antoon, T.A. (#27079)
Misty@antoonlaw.com
2312 S. MacArthur Drive
Alexandria, LA 71301
318.792.3514

*Counsel for Defendants, City of Alexandria, Officer Samuel Terrell and Former Chief Ronney Howard*

47